## U.S. COURT OF APPEALS DOCKET NO. 13-56223

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

MICHAEL NOZZI,
individually and as class representative,

Plaintiff(s)/Appellant(s)

vs.

HOUSING AUTHORITY
OF THE CITY OF LOS ANGELES, et al.

Defendant(s)/Appellee(s)

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## CASE NO. CV-07-00380 GW (FFMx)
## [THE HONORABLE GEORGE H. WU]

---

## APPELLANTS' OPENING BRIEF

Barrett S. Litt, SBN 45527
Kaye, McLane, Bednarski &
Litt, LLP
234 East Colorado Boulevard
Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
E-Mail: blitt@kmbllaw.com

Patrick Dunlevy, SBN 162722
Lisa R. Jaskol, SBN 138769
Stephanie Carroll, SBN 263698
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089
E-Mail: pdunlevy@publiccounsel.org

# TABLE OF CONTENTS

**I. INTRODUCTION AND SUMMARY OF ARGUMENT** .....................................1

**II. JURISDICTIONAL STATEMENT** ....................................................7

**III. ISSUES PRESENTED** ....................................................................8

    1. Did the District Court violate the law-of-the-case and rule of mandate doctrines by granting summary judgment on the same record? .................8

**IV.  STATUTORY ADDENDUM** ........................................................8

**V.  STATEMENT OF FACTS** ..............................................................8

  A.  Initial 2009 Appeal and the Ninth Circuit's Reversal of the Trial Court, Including Procedural History Through First Appeal ..........................9

  B.  The Trial Court's Difficulties With the Ninth Circuit's 2011 Opinion and Remand Order ........................................................................10

  C.  Post-Remand Discovery Sought By Plaintiffs .................................13

  D.  Defendants' Renewed Motion for Summary Judgment .....................16

  E.  Factual Record Underlying Both the 2009 Appeal and the Instant Appeal ....................................................................................17

      1. Background of Section 8 Program...................................17

      2. Framework for Decreasing the VPS ...............................19

      3. HACLA's Decision to Reduce VPS ................................21

      4. HACLA's Failure To Provide Adequate Notice ..............22

      5. The Representative Plaintiffs..........................................25

**VI.     PROCEDURAL HISTORY** ........................................................28

**VII.     STANDARD OF REVIEW** .......................................................28

# ARGUMENT

I.  THE PRIOR PANEL DECISION ON THE DUE PROCESS AND
    815.6 CLAIMS IS LAW-OF-THE-CASE AND CONTAINS THIS COURT'S
    MANDATE, REQUIRING REVERSAL ON THESE CLAIMS....................29

    A.  The Holding That Genuine Issues Of Material Fact Precluded
        Summary Judgment And Remanding With Directions Bound
        The Lower Court When Addressing Summary Judgment On
        The Same Factual Record. ..............................................................29

    B.  The District Court Improperly Granted Summary Judgment On
        Plaintiffs' Federal And State Due Process Claims. ........................31
        1.  The Remand Required Recognition That There Were Disputed
            Issues Of Fact Regarding Whether HACLA's One-Year VPS
            Reduction Notice Satisfied Plaintiffs' Due Process Rights..........31
        2.  HACLA's Renewed Summary Judgment Motion Invited The
            District Court To Violate The Law-of-the-Case Doctrine And
            This Court's Mandate. ...............................................................32
        3.  The District Court Violated The Law-of-the-case Doctrine And
            This Court's Mandate By Granting HACLA's Renewed
            Summary Judgment Motion On Plaintiffs' Due Process Claims. .34

    C.  The District Court Violated The Law-of-the-case Doctrine And
        This Court's Mandate By Granting HACLA's Renewed Motion For
        Summary Judgment On Plaintiffs' Claim For Violation Of
        Government Code § 815.6. ..............................................................38

II.  THE DISTRICT COURT GRANTED SUMMARY JUDGMENT
     ON PLAINTIFFS' NEGLIGENCE CLAIM IN VIOLATION OF
     THE LAW-OF-THE-CASE DOCTRINE AND THIS COURT'S
     MANDATE.........................................................................................39

III.  THE DISTRICT COURT ERRED IN ITS DUE PROCESS
      ANALYSIS AND EVALUATED IRRELEVANT EVIDENCE ............40

     A.  The District Court Misconstrued the Property Interest...............40

B. This Court's Prior Opinion Refers Only to the Initial Notice Sent One Year Before the VPS Reduction ............................................................44

C. The Trial Court Failed to Properly Apply the *Mathews v. Eldridge* Factors ...........................................................................................................45

D. Defendants' Alleged Evidence of Post-Notice "Outreach" and Education Efforts is Irrelevant Given the Definition of the Property Interest Articulated in *The Prior Opinion.*............................................................46

E. *Rosas* is Inapplicable ................................................................................48

**IV. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT ON PLAINTIFFS' §815.6 CLAIM** ................................................................50

**V. THE DISTRICT COURT ERRONEOUSLY DISMISSED PLAINTIFFS' NEGLIGENCE CLAIM**..............................................................................56

**VI. THE DISTRICT COURT IMPROPERLY DENIED PLAINTIFFS' RULE 56 (D) MOTION.**..............................................................................................56

**VII. CONCLUSION.** ...........................................................................................58

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alcaraz v. I.N.S.*
  385 F.3d 1150 (9th Cir. 2004) ............................................................43

*Atkins v. Parker*
  472 U.S. 115 (1985)...........................................................13, 31, 40

*Bd. of Regents v. Roth*
  408 U.S. 564, 92 S.Ct. 2701 (1972)...................................................43

*Billington v. Underwood*
  613 F.2d 91 (5th Cir. 1980) ...............................................................51

*Budnicki v. Beal*
  450 F.Supp. 546 (E.D.Pa.1978)..........................................................42

*Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck
  Reservation*
  323 F.3d 767 (9th Cir. 2003) ..............................................................58

*Burrell v. McIlroy*
  464 F.3d 853 (9th Cir.2006) ...............................................................47

*Butland v. Bowen*
  673 F.Supp. 638 (D.Mass. 1987).........................................................51

*Chavez v. United States*
  683 F.3d 1102 (9th Cir. 2012) ............................................................57

*Crow Tribe of Indians v. Montana*
  92 F.3d 826 (9th Cir. 1996) ..................................................................7

*David v. Heckler*
  591 F. Supp. 1033 (D.C.N.Y. 1984) (Weinstein, J.) .........................51

*Davis v. United States*
  589 F.2d 446 (9th Cir.1979) ...............................................................47

*Eichman v. Fotomat Corp.*
  880 F.2d 149 (9th Cir. 1989) ........................................................29, 30

*Fonseca v. Sysco Food Serv., Inc.*
 374 F.3d 840 (9th Cir. 2004) ................................................................28

*Geneva Towers Tenants Organization v. Federated Mortgage Investors*
 504 F.2d 483 (1974).............................................................................55

*Hall v. City of Los Angeles*
 697 F.3d 1059(9th Cir. 2012) ........................................................29, 37

*Handi Inv. Co. v. Mobil Oil Corp.*
 550 F.2d 543 (9th Cir. 1977) ...............................................................58

*Hoffman v. Tonnemacher*
 593 F.3d 908 (9th Cir. 2010) ...............................................................34

*In Re Rainbow Magazine, Inc.*
 77 F.3d 278 (9th Cir. 1996) .................................................................29

*Kimble v. Solomon*
 599 F.2d 599 (4th Cir.) ..................................................................42, 43

*Lovell v. Chandler*
 303 F.3d 1039 (9th Cir. 2002) .............................................................28

*Mathews v. Eldridge*
 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)......................passim

*Merritt v. MacKey*
 932 F.2d 1317 (9th Cir. 1991) .............................................................28

*Morton v. Ruiz*
 415 U.S. 199 (1974)..............................................................................42

*Mullane v. Central Hanover*
 339 U.S. 306 (1950)..............................................................................51

*Nozzi v. Hous. Auth. of City of Los Angeles*
 CA 9 Case No. 09–55588, 425 F. App'x 539 (9th Cir. 2011) ....................passim

*Patty Precision v. Brown & Sharpe Mfg. Co.*
 742 F.2d 1260 (10th Cir.1984) ............................................................57

*Radobenko v. Automated Equipment Corp.*
520 F.2d 540 (9th Cir. 1975) ........................................................................30, 37

*Rochester v. Baganz*
479 F.2d 603 (3rd Cir.1973) ..............................................................................42

*Rosas v McMahon*
945 F.2d 1469 (9th Cir. 1991) ................................................................48, 49, 50

*Sicor Ltd. v. Cetus Corp.*
51 F.3d 848 (9th Cir. 1995) ...............................................................................30

*Stonum v. CCH Computax Inc.*
34 F.3d 1073 (9th Cir. 1994) .............................................................................57

*Thomas v. Bible*
983 F.2d 152 (9th Cir. 1993) .............................................................................28

*U.S. v. Heffner*
420 F.2d 809 (4th Cir. 1969) .............................................................................43

*United States ex rel. Accardi v. Shaughnessy*
347 U.S. 260 (1954).......................................................................................42, 43

*United States v. James Daniel Good Real Property*
510 U.S. 43, 114 S.Ct. 492 (1993).....................................................................45

*VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*
784 F.2d 1472 (9th Cir.1986) ............................................................................58

### STATE CASES

*County of Los Angeles v. Superior Court*
102 Cal.App.4th 627 (2002) ..............................................................................54

*Frank v. Kizer*
213 Cal. App. 3d 919 (1989) ..............................................................................51

*Guzman v. County of Monterey*
46 Cal. 4th 887 (2009) .......................................................................................54

*Haggis v. City of Los Angeles*
22 Cal.4th 490 (2000) ........................................................................................53

*Michael Nozzi v. HACLA*
   09-55588 ...................................................................................................14

## FEDERAL STATUTES

28 U.S.C. §1291 ...............................................................................................8

28 U.S.C. §1331 ...............................................................................................7

28 U.S.C. §1367 ...............................................................................................8

42 U.S.C. §1437f ............................................................................................18

42 U.S.C. §1983 ................................................................................7, 8, 9, 10

## OTHER STATUTES

Cal. Civil Code §1714 ......................................................................................8

Cal. Gov't. Code §14 ......................................................................................54

*Cal. Govt. Code* §810.6 .................................................................................53

*Cal. Govt. Code* §811.6 .................................................................................53

Cal. Govt. Code §815.6 ...........................................................................passim

## RULES

Rule 26 ...........................................................................................................15

Rule 56(d) ................................................................................................passim

Rule 56(f) .................................................................................................57, 58

## REGULATIONS

24 C.F.R. §982.1 ............................................................................................18

24 C.F.R. §982.505(a) ....................................................................................18

24 C.F.R. §982.505(c)(3)(ii) .....................................................................20, 51

24 C.F.R. §982.516(a) ....................................................................................19

24 C.F.R. §§ 982.52(a), 982.54(a)-(c) .................................................................18

24 C.F.R. § 982.503(a)..........................................................................................19

24 C.F.R. § 982.503(b) ..........................................................................................20

24 C.F.R. § 982.505. 425 .................................................................................passim

24 C.F.R. § 982.505(c)(3) ......................................................................................20

24 C.F.R. § 982.505(c)(3)(i) ..................................................................................54

24 C.F.R. § 982.505(c)(3)(ii) ...........................................................................54, 55

24 C.F.R. §§ 982.505(c)(3)-(c)(4) and...................................................................53

24 C.F.R. § 982.505(c)(4) ................................................................................19, 20

24 C.F.R. § 982.505 and § 815.6 ..........................................................................40

CONSTITUTIONAL PROVISIONS

Article I, §7 of the California Constitution...........................................................2, 9

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Because this is a successor appeal in which the District Court granted summary judgment previously reversed by this Court on the same fundamental issues and record as presented in this appeal, we provide a somewhat more detailed overview than normal in this Introduction/Summary of Argument.

On March 25, 2011, this Court reversed the District Court's dismissal and grant of summary judgment to Defendants. *Nozzi v. Hous. Auth. of City of Los Angeles*, CA 9 Case No. 09–55588, 425 F. App'x 539 (9th Cir. 2011). The central issue in all reversed claims was the adequacy of the notice that Defendant HACLA (Housing Authority of the City of Los Angeles) provided to Section 8 tenants, among the poorest and most vulnerable in our society, when it reduced Plaintiffs' Section 8 benefits without effectively or meaningfully providing the one year advance notice required by federal and state law. Plaintiffs contended that the notice sent did not comply with due process standards. HUD regulations required notice one year in advance of any adverse change in benefits, which Plaintiffs contended was part of the property interest in their benefits, i.e., that they were entitled to notice that comported with due process of an anticipated adverse change in benefits a year before the change took effect.

This Court agreed: "[T]he statute in tandem with the regulatory requirements 'restricting the discretion' of HACLA…creates a property interest in Section 8

1

benefits to which constitutional due process attaches." 425 F. App'x at 541. The opinion explained that the length of the advance notice was a component of the property interest, noting that:

> "Because the Section 8 regulations 'closely circumscribe' HACLA's discretion – by prohibiting HACLA from immediately implementing a reduced VPS, and requiring HACLA to inform participants that a reduced VPS will be implemented – Plaintiffs' property interest is protected against avoiding an abrupt and unexpected change in benefits." *Id*.

This Court concluded that the case should be remanded because "genuine issues of material fact exist[ed] as to whether the notice HACLA provided satisfied the requirements of due process." *Id*. at 542. The claims remanded by this Court were due process claims under §1983 and Article 1 §7 of the California Constitution, Cal. Govt. Code §815.6 (mandatory duty) and negligence under California law.

The background to the case is that, in 2004, HACLA decided to lower its financial contribution to Section 8 tenants' rents, a permitted determination. Section 8 tenants are generally very poor, with meager resources. Under HUD regulations, a Housing Authority intending to reduce its financial contribution to tenants' rent (technically a reduction in the Voucher Payment Standard ("VPS")), is required to provide tenants with notice of the change at least one year before the

2

reduction takes effect. This regulation is intended to protect assisted families from sudden reductions in subsidies.

HACLA sent a notice to tenants one year in advance of the change in a stack of undifferentiated papers regarding tenants' reexamination. The language of the notice, and the table it contained, supposedly explained the change. Plaintiffs contended the notice and language were unintelligible to the average person, much less the average reader one would expect from the Section 8 population. The term "voucher payment standard" was not explained in the notice, and Plaintiffs contended that the language that payments standards were "lowered" appeared to confer a benefit and was thus confusing and misleading.

The full and complete text of the notice is reproduced below in single spacing (with a different font):

### HOUSING AUTHORITY OF THE CITY OF LOS ANGELES
### NOTICE

Effective April 2, 2004, the Housing Authority lowered the payment standards used to determine your portion of the rent. We will not apply these lower payment standards until your next regular reexamination. If you move, however, these new lower payment standards will apply to your next unit.

### PAYMENT STANDARDS and
### TENANT-BASED SHELTER PLUS CARE PAYMENT STANDARDS
### EFFECTIVE APRIL 2, 2004

3

| Bedroom Size | Payment Standards |
|---|---|
| Mobile H. Space | $463 |
| SRO | $505 |
| 0 | $674 |
| 1 | $807 |
| 2 | $1,021 |
| 3 | $1,378 |
| 4 | $1,646 |
| 5 | $1,892 |
| 6 | $2,139 |
| 7 | $2,386 |

Regardless of its location, the unit's rent can never be higher than the comparable rents determined by the Housing Authority. [ER 11]

On remand, the District Court expressed on numerous occasions that it either did not understand, or disagreed with the Ninth Circuit decision. *See, e.g.,* [ER 31] ("I just don't understand what they expect me to do because I don't understand how I can do it because it doesn't make sense under the law"). Ultimately, the Court considered Defendants' resubmitted summary judgment motion on the same basic record, which the Court supplemented with answers to ten questions it propounded. [ER 45, 46]  The sole difference was that Defendants added the prior declaration of Agbor I. Agbor to its summary judgment motion (which they originally had submitted only in opposition to Plaintiffs' summary judgment motion) [ER 29  ]; that declaration contended that Section 8 tenants understood the challenged notice because HACLA provided training to, and convened meetings for, Section 8 tenants on such matters.

4

Plaintiffs submitted an additional declaration by Named Plaintiff Pelaez [ER 53] saying that she recalled no such training and could not understand the notice, and providing a more recent notice demonstrating that HACLA was fully capable of providing a more intelligible notice than the challenged notice. Plaintiffs filed a Rule 56(d) Declaration and explained they had not yet had the opportunity to canvas or survey putative class members regarding HACLA's claims of Section 8 tenants' training and understanding of facially confusing terms used in the notice, nor had they had the opportunity to conduct more depositions of HACLA staff. When that Declaration was filed, Plaintiffs had not yet received any database information regarding the affected Section 8 tenants. By ruling on Defendants' motion, the Court *sub silentio* denied that motion.

Misconstruing this Court's directive to apply the standards of *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) the District Court concluded that the entirety of the notification process demonstrated that due process had been complied with. To do so, it focused on the notice given four weeks before the change in benefits took effect, not the one year notice that was the heart of the prior appeal, and granted summary judgment again. The Court requested that, if it were again reversed, a new District Court judge be assigned. [ER 64]

5

The four week advance notice on which the District Court relied was part of the earlier appeal's record. Defendants argued in that appeal that the second notice showed that due process standards were met. Plaintiffs never contended that the four week notice was deficient, but that it did not solve the problem of the one year advance notice's deficiencies, which independently had to meet due process standards. If the sufficiency of that four week notice cured the previous notice's deficiencies, then this Court could and presumably would have affirmed the prior summary judgment.[1] The District Court's approach thus contravened this Court's conclusion that there was "a genuine issue of material fact as to whether HACLA's notice sufficiently protected Plaintiffs' property interest", which was specifically defined to include the advance notice requirement of 24 C.F.R. §982.505. 425 F. App'x at 541 ("Plaintiffs' property interest is protected against an abrupt and unexpected change in benefits").

*Mathews* provides that due process requirements are "flexible" depending on the overall circumstances. 424 U.S. at 334. As Plaintiffs repeatedly argued, whatever flexibility there may be, 1) the notice was so deficient that it violated even the most minimal due process standards, and 2) as this Court concluded, it

---

[1] Although the District Court did not specifically so state, the concurring opinion by District Judge Mossman, not joined by either Judges Trott or Wardlaw, on the prior appeal suggested that this four week notice could be a basis to find that due process standards had been met. The logical conclusion of that analysis is to affirm rather than reverse.

6

was at least an issue of disputed fact whether the notice was sufficient. This Court's previous opinion was clear that the issue was the challenged notice, not the notice given one month before the change took effect.

Plaintiffs thus appeal the District Court's grant of summary judgment and effective denial of their Rule 56(d) objection, because 1) it violated the law-of-the-case doctrine, essentially rejecting this Court's analysis and directive, and replacing it with a new one inconsistent with it (*see, e.g., Crow Tribe of Indians v. Montana*, 92 F.3d 826, 828 (9th Cir. 1996) ("the [district] court failed to give appropriate weight to the law of this case as established in the three prior appeals")); and 2) in any event, for the reasons explained in that opinion and in Plaintiffs' prior and current briefs, the District Court erroneously granted summary judgment where there were at least disputed issues of fact regarding the adequacy of the challenged notice, and Plaintiffs had not had the opportunity to conduct discovery regarding Defendants' contention that Section 8 tenants understood the technical, confusing and incomprehensible language used to provide notice.

## II.    JURISDICTIONAL STATEMENT

The primary underlying claims forming the basis for this appeal were brought pursuant to 42 U.S.C. §1983. The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question jurisdiction). The

District Court exercised supplemental jurisdiction over related state law claims under 28 U.S.C. §1367.

The Court of Appeals has jurisdiction over this appeal pursuant to 28 U.S.C. §1291. A final judgment was entered in the District Court on June 12, 2013. [ER 65] A timely notice of appeal was thereafter filed on July 11, 2013. [ER 66]

## III.    ISSUES PRESENTED

1.    Did the District Court violate the law-of-the-case and rule of mandate doctrines by granting summary judgment on the same record?

2.    Independent of those doctrines, did the District err by granting summary judgment on Plaintiffs' Due Process and state law claims?

3.    Did the District Court abuse its discretion by failing to grant Plaintiffs' Rule 56(d) objection/motion?

## IV.    STATUTORY ADDENDUM

Attached as an addendum to the brief are copies of 42 U.S.C. §1983, 24 C.F.R. §982.505, Cal. Govt. Code §815.6, Cal. Civil Code §1714 (negligence),  and *Nozzi v. Hous. Auth. of City of Los Angeles*, 425 F. App'x 539 (9th Cir. 2011).

## V.    STATEMENT OF FACTS

In this Statement of Facts, we integrate the three discrete phases of this case (first summary judgment, appeal, second summary judgment), discussing first the appeal, then the District Court's response to it, and finally the common record for

8

the two appeals. As we explain, the renewed grant of summary judgment was based on the same record as that before this Court in the previous appeal and presented the identical issues as the first[2]. As with the initial appeal, the facts essential to determination of the legal issues are not subject to meaningful dispute.

A.    INITIAL 2009 APPEAL AND THE NINTH CIRCUIT'S REVERSAL OF THE TRIAL COURT, INCLUDING PROCEDURAL HISTORY THROUGH FIRST APPEAL

Plaintiffs filed their complaint on January 16, 2007, against the City of Los Angeles, HACLA and Rudolf Montiel, then executive director of HACLA. [Dkt. 1] The District Court granted certain motions to dismiss, the only one of which that is relevant here is dismissal of Plaintiffs' negligence claim (later reversed by this Court). [*Nozzi v. Hous. Auth. of City of Los Angeles*, *supra*, ¶[4].] On Cross-Motions for Summary Judgment as to Plaintiffs' First (42 U.S.C. §1983 ("due process"), Third (California Government Code §815.6), and Fourth (Article I, §7

---

[2] There are only two essential differences in the record.

    First, Defendants, at the trial court's request, added the Declaration of Agbor I. Agbor to their summary judgment motion. Previously, it was in their Opposition to Plaintiffs' summary judgment motion, but was not filed in support of their motion. [Dkt. 78-3] Because this was in the record, it was available for this Court to rely on during the prior appeal if it so chose and, in fact, was referenced in Judge Mosman's concurrence.

    Second, Plaintiffs submitted a Declaration from Plaintiff Pelaez indicating that she did not understand the initial notice, did not recall receiving it, did not recall ever having "VPS" explained to her or attending tenant meetings regarding Section 8 [ER 53]; Plaintiffs attached a later notice demonstrating that HACLA was fully capable of providing a notice that was understandable (although Plaintiffs consider it still less comprehensible than it could have been). [ER 52, p.647_]This is addressed in Section IV(C), *infra*.

of the California Constitution – "due process") Causes of Action, the District Court

granted Defendants' summary judgment on March 8, 2009.    [ER 20]

Plaintiffs appealed. On March 25, 2011, this Court reversed the grant of

summary judgment and dismissal on the federal and state due process claims,

Government Code §815.6 mandatory duty claim, and the State negligence claim.[3]

The central issue in all reversed claims was the adequacy of the initial notice and

the existence of a property interest in advance notice in light of the combination of

the statute and regulations. We explained the notice and this Court's prior ruling in

the Introduction/Summary of Argument and will not repeat it here. After the

opinion issued, Defendants sought rehearing and rehearing en banc, which was

denied on May 13, 2011.

B.    THE TRIAL COURT'S DIFFICULTIES WITH THE NINTH CIRCUIT'S 2011
      OPINION AND REMAND ORDER

On no fewer than twenty-one occasions between the time the Ninth Circuit

decision was remitted through the hearings on Defendants' renewed motion for

summary judgment, the trial court expressed a lack of understanding of, or

disagreement with, the Ninth Circuit's ruling.[4] We point this out because that

dynamic, which the District Court itself recognized, colored the post-remand

---

[3] Dismissal of the claim that the combination of the statute and regulations
provided an independent private right of action under §1983 was upheld.
[4] See, in addition to cites in the body of this Section, the following transcript
references: [ER 30; 31; 32; 33; 36; 48; 57 and 64]
.

10

proceedings. Plaintiffs were unable to proceed with what they understood to be the directive of the remand – to complete discovery and ultimately proceed to trial if the case could not settle. Rather, the hearings, even when not intended for that purpose (e.g., to discuss discovery), ended up returning to the Court's view of the Ninth Circuit ruling. See cites in Fn. 4.

By the District Court's own description, it found the conclusion that Plaintiffs' property interest in their benefits included the advance notice embodied in the regulations problematic at best. *Id*. To the District Court, this Court's analysis in reversing the prior summary judgment was a combination of confusion, incomprehensible or legally wrong. Illustrative of the District Court's approach is the following statement:

> "My problem I guess with the Ninth Circuit is it seems to me inconsistent to have ruled that the federal regulations cannot give rise to a 1983 action because, you know, that's where the notice requirement comes in. And so, in other words, if that does not give rise to a 1983 action, I don't understand how -- whatever they're talking about otherwise can give rise to a 1983 action." [ER 33]

> In a similar vein, at a later hearing, the trial court stated:

> "I don't understand how because of the fact that the regulation itself does not create a due process right, but you're saying that when they created this regulation that somehow they created a due process right to notice beyond the technical requirements of the regulation itself, which the Ninth Circuit may have found; but that's what I don't understand. I don't understand how the Ninth Circuit could find that. It doesn't make sense. It doesn't make sense in the law." [ER 57]

11

While at times the District Court acknowledged that the advance notice requirement was part of the due process analysis, e.g., [ER 31], it regularly returned to its problems with the Ninth Circuit opinion. The heart of the approach ultimately taken by the District Court to grant summary judgment was that it did not accept that Plaintiffs had a property interest in advance notice, arising from the *conjunction* of the Section 8 statute with the advance notice regulation, such that there would not be an "abrupt and unexpected change in benefits," thereby triggering the requirement that the challenged notice meet due process standards.

The Ninth Circuit's mandate that the factors in *Mathews v Eldridge*, 424 U.S. 319, 96 S.Ct.893, 47 L.Ed. 2d 18 (1976) be applied to determine what process was due, 425 Fed.Appx. at 542, became a focus on the totality of the notification process, rather than on whether Plaintiffs received due process notice in the original, challenged notice.[5] But this action is, and always has been, centered around the effect of the unique regulatory provision of a far-in-advance notice requirement on the due process analysis. This Court recognized that the effect of the statute in combination with the regulation was to protect Section 8 recipients from an "abrupt and unexpected change in benefits." The District Court thus expressed the view that it did not see how *Mathews* applied:

---

[5] Although at times the trial court appeared to acknowledge that the focus of the appellate opinion was the advance notice requirement, see [ER 30; 31; 32, and 36], in general the court conflated the entire set of notice provisions occurring before the actual reduction in benefits as part and parcel of the same property right.

12

"…if one were to apply the *Matthews v. Eldridge* analysis, you would come out with the conclusion that it's not applicable. Unless you were to find that the Plaintiffs had a constitutional right to the notice which the Supreme Court has continuously said there is no right citing such cases as *Atkins* that the Ninth Circuit looked at but didn't comprehend. So now we have the situation where I'm supposed to do a *Matthews v. Eldridge* analysis on a notice that, you know, the question of the sufficiency when there is no -- there would have been no detrimental effect because the persons either properly had their rates lowered and they agreed to it, or it if was improperly lowered, they could have, you know, raised it in the process that's already been provided for which is the *Matthews v. Eldridge* process. So I don't quite understand why this case is still in front of me." [ER 36]

Similarly, although at times the District Court appeared to agree that there was a need for further factual discovery and analysis, *see, e.g*., ER 30; 32, it ultimately relied on a variant of its original faulty rationale to dispose of the case, *i.e*., finding that the language of the initial notice parroting the literal (incomprehensible) language of the regulation, in combination with the later notice given a month before the planned reduction, was sufficient to comply with due process. [ER 63]  This effectively eviscerated the advance notice requirement. The Court's ruling was based on a disputed factual record that was identical to the record from the first summary judgment appeal (except, as we explain in the next section, for the added Declaration of Plaintiff Pelaez).

C.     POST-REMAND DISCOVERY SOUGHT BY PLAINTIFFS

After remand, the parties agreed to and filed a discovery plan in the form of a Joint Status Report. [ER 35]. The parties agreed to phased discovery, starting with database discovery (regarding class members) and moving on to class

13

certification, and then fact-based discovery. *Id.* at p.2. In fact, in exchange for this agreement, no further depositions would occur until database discovery was completed. *Id.*

Plaintiffs' proposed discovery was intended to answer the question  whether Defendants' notice was effective notice. The database discovery would allow Plaintiffs to identify and contact affected Section 8 recipients to ask whether and to what extent they understand the one-page notice as reducing the rent subsidy they receive from HACLA, and what exposure they had to language used in the notice. During oral argument at the Court of Appeals, Judge Trott in particular told counsel that he believed the issue was what a reasonable Section 8 tenant would understand when reading the one-page notice. [Audio of first appellate argument: *Michael Nozzi v. HACLA*, 09-55588, Mosman, Trott, Wardlaw, Pasadena, CA, 12/08/2010]

Plaintiffs timely propounded discovery requests that included the database in electronic form, identification of the Section 8 tenants who received the notice in question, and the amount of VPS decrease for each such tenant. When Plaintiffs filed their Rule 56(d) objection/declaration, the database had not yet been produced. [ER 40, 52] That data was not produced until after Defendants had already filed their summary judgment motion, Plaintiffs had filed their initial opposition, and after multiple extensions of time to produce the discovery at Defendants' request.

14

[ER 35; 37; 38; 43; 44] The data was only received after the initial briefings on Defendants' renewed summary judgment (but before the ruling). Plaintiffs had not had the opportunity to conduct investigation, a survey or depositions of putative class members. [ER 51] The next step would have been to conduct Person Most Knowledgeable depositions to determine that the datasets provided were complete. Once those preconditions were satisfied, Plaintiffs intended to contact putative class members and ultimately conduct a survey of affected Section 8 recipients, utilizing the services of an expert to construct and conduct the survey. [ER 40; 41; 50; 51; 52]

Plaintiffs also objected in their Rule 56(d) Declaration to the Declaration of Agbor I. Agbor which had previously been submitted in Defendants' Opposition to Plaintiffs' original summary judgment motion in 2009 and objected to then, and again in 2013. [ER 50, p.6] The objection was on the grounds that Agbor was not previously disclosed as a witness either in Defendants' Rule 26 exchange or in subsequent interrogatory responses, and that fact discovery was not scheduled to recommence until after the data production was complete and after depositions to ensure it was complete occurred. At that point, Plaintiffs would need time to (a) investigate Mr. Agbor's contentions with putative class members, and (b) depose him. [ER 52] Plaintiffs did not have an opportunity to depose Mr. Agbor as the parties had agreed to limit discovery to class certification issues only, and stayed

15

all other discovery, in a status report submitted to the court for which no order was requested. [ER 35] Therefore, Plaintiffs did not have the opportunity to speak with putative class members as summary judgment occurred shortly after the class list was produced.

D.     DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

With the District Court's permission, Defendants filed a renewed motion for summary judgment. [ER 39] Defendants' renewed motion consisted of the Agbor and Baldwin Declarations that were part of the Defendants' Opposition to Plaintiffs' previous summary judgment motion (discussed above) and otherwise of the underlined identical exhibits, declarations and uncontroverted facts and conclusions of law filed with the previous summary judgment, supplemented by the District Court's overturned prior summary judgment ruling from 2009.[6] *See*, ER 39, p.2:16-26.

On February 21, 2013, before hearing Defendants' renewed motion, the trial court requested the parties address ten separately enumerated issues, including with appropriate references to the record and/or alternatively through the submission of

---

[6] The Baldwin declaration was objected to as part of Plaintiffs' Opposition [ER 50] on the grounds that it lacked foundation and because Baldwin failed to provide a copy of the "similar chart" he declared tenants were familiar with; it had been objected to previously when first produced to support Defendants' Opposition to Plaintiffs' Summary Judgment Motion. In its ruling the trial court dismissed Plaintiffs' objections without any explanation: "This court would find Plaintiffs' objections to the Baldwin Declaration groundless." [ER 63, fn.15, p.899]

additional materials. [ER 45, 46]. At the subsequent hearing on February 25, 2013, the Court explained that its reasons for the request "is my feeling that the circuit court doesn't understand the factual situation that's involved here, and I think that's, to my mind, crystal clear. So, therefore, I want to make the record as crystal clear as possible so that that will not happen in the future." [ER 48] It therefore asked Defendants to "file a supplemental statement of uncontroverted facts which will include those additional elements" The trial court commented that this Court's opinion appeared to disagree with Supreme Court precedent.

Not only did the District Court call for this supplemental filing, but it specifically told Defendants to include references to the objected to Agbor declaration discussed above in the supplemental statement.  The Court emphasized that Defendants "need to put those [the Agbor] facts in a statement of uncontroverted facts and then they [Plaintiffs] will respond to those facts."

The District Court again granted Defendants' summary judgment. [ER 65] In addition, on its own initiative, the Court requested that a new District judge be assigned if summary judgment were again reversed. [ER 64]

E.    FACTUAL RECORD UNDERLYING BOTH THE 2009 APPEAL AND THE INSTANT APPEAL

### 1.    Background of Section 8 Program

The Housing and Community Development Act of 1974 authorized and established the Section 8 Program to be administered by the local Public Housing

17

Authorities ("PHA's"). [ER 8] The Section 8 Program, funded by the U.S. Department of Housing and Urban Development ("HUD"), provides housing assistance, a portion of rent and utilities, to extremely low and very low-income families, senior citizens, and disabled or handicapped persons. *Id.* Its objective is to provide affordable, decent and safe housing for eligible families, while increasing a family's residential mobility and choice. *Id.*

HACLA is a Public Housing Authority established under 42 U.S.C. §1437f. As such, it is required to establish and administer local policies that comply with federal regulations and requirements. 24 C.F.R. §§982.52(a), 982.54(a)-(c). In 1975, HACLA implemented the Section 8 Program providing rent subsidies in the form of housing assistance payments (HAPs) to private landlords on behalf of eligible families in Los Angeles. [ER 8] HACLA, a state chartered public housing agency since 1938, now administers the second largest Section 8 Program in the country. *Id.*

In May 1999, HUD created a new Section 8 Program called the "Housing Choice Voucher Program." 24 C.F.R. §982.1. The local PHA administers the Housing Choice Voucher Program under contract with HUD, and has the responsibility of determining the Voucher Payment Standard ("VPS") – the maximum monthly subsidy a Housing Authority can provide to a family. *See* 24

18

C.F.R. §§982.1 and 982.505(a).[7] The VPS is the subsidy generally needed to allow a Section 8 recipient to rent a moderately-priced dwelling unit in the local housing market, and is used to calculate the amount of housing assistance a family will receive. C.F.R. §982.505(a); [ER 14]. According to HUD, 84% of HACLA's tenant based vouchers are in the "Extremely Low Income, Below 34% Of Median" category, with an average income of $14,197.[8]

### 2.    *Framework for Decreasing the VPS*

Under HUD regulations, Housing Authorities conduct annual reexaminations to verify income and recertify family composition. 24 C.F.R. 982.516(a). With that information, the Housing Authority calculates the tenant's share of rent, which is subtracted from the gross rent to determine the payment due from the Housing Authority. 24 C.F.R. §982.505(c)(4). The VPS subsidy – the amount that a housing authority contributes to the rent – is determined by the size of the unit (based on the number of bedrooms) and the Fair Market Rent ("FMR") established by HUD for the Metropolitan Statistical Area in which the Housing Authority operates. 24 C.F.R. §982.503(a). The Housing Authority may establish

---

[7] The text of the entire regulation is at [ER 18] and repeated in the Appendix.

[8]

https://hudapps.hud.gov/public/picj2ee/Mtcsrcr?category=rcr_income&download=false&count=0&sorttable=table1.

the VPS amount for a unit size at any level between 90% and 110% of the published FMR for that unit size. 24 C.F.R. §982.503(b).

In 2003, the VPS set by HACLA was at the highest level allowed by HUD – based on the 50th percentile and 110% of FMR. [ER 13, p.122] This was in recognition of the high cost of housing in the Los Angeles area. *Id.* The higher the VPS, the greater the rental share paid by the Housing Authority rather than the tenant. *Id.* Conversely, the lower the VPS, the lesser the share paid by the Housing Authority and the greater the share paid by the tenant. *Id.*

PHAs such as HACLA have discretion to raise or lower the VPS within a statutorily-prescribed range. 24 C.F.R. §982.503(b). Before lowering the VPS, however, Housing Authorities must comply with a very specific timeline relating to notice. A PHA must provide proper notice to a recipient whose benefits are being reduced at the **first** annual re-examination following the adverse VPS change. 24 C.F.R. 982.505(c)(3)(ii). <u>The actual reduction in benefits cannot occur until one year after this notice</u>, upon the completion of the **second** re-examination after the effective date of the decision to decrease the level of services. *Id.* As a comparison, an <u>increased VPS</u> is applied at the <u>first</u> annual reexamination after its effective date (because an increased VPS benefits the tenant financially). 24 C.F.R. §982.505(c)(4). But a <u>decreased VPS</u> cannot be applied until the <u>second</u> annual reexamination. 24 C.F.R. §982.505(c)(3). Initially, this "payment standard

protection" applied only to the first two years of a family's lease under Section 8. Federal Register, Vol. 66, p.56894 (October 21, 1999). On reconsideration, HUD extended payment standard protection for the whole of the tenancy. Thus, "a family is not subject to a subsidy reduction until the second regular reexamination of family income and composition following the payment standard reduction." HUD saw this extension to all assisted families as a "broader and more equitable regulatory safeguard against reductions in subsidy." Federal Register, Vol. 65, p.42508 (July 10, 2000). The purpose of this notice requirement is obvious: to advise recipients that they would be responsible for a higher rent payment, and to give residents a full year to make arrangements to adapt to this greater financial obligation. See also Statement of Section 8 Director Steven Renehan to the HACLA Board of Commissioners, 3/26/04 ("I believe HUD wrote this into the regulation as a protection to families so that if there were significant cut to the voucher payment standard, they'd have at least a year to prepare for that") [ER 6, pp.95, 96]

### 3.    *HACLA's Decision to Reduce VPS*

On March 2004, HACLA reduced the pre-existing VPS. At their meeting on 3/26/04, HACLA's Board of Commissioners approved the 2004 VPS reduction via a vote revising the Section 8 Administrative Plan. [ER 6] HUD required HACLA to reduce expenditures to bring its spending on Housing Assistance Payments

21

("HAP") into line with the HUD budget at the time. As a result, HACLA elected to use its discretionary authority to reduce the HAP expenditures, including lowering the VPS. The impact was significant. For example, the VPS for a 0-bedroom ("bachelor") apartment went from $795 to $674, a benefit reduction of $121. [ER 15]

Although the precise amount of the increase in the portion of rent that Section 8 recipients themselves would have to pay was not known when HACLA mailed out the VPS reduction notice a year before the reduction went into effect, HACLA itself was aware that somewhere between 40-45% of its 45,000 Section 8 recipients, i.e., somewhere between 18,000-22,250 people, would be affected negatively in an actual and concrete way by the VPS decrease. *See* [ER 5, pp.78-91]; [ER 28, pp.275-287]

### 4. *HACLA's Failure To Provide Adequate Notice*

To provide notice of the VPS reduction, HACLA mailed a one-page flyer/notice – buried among a large packet of papers – to each recipient on or about the date of their next annual re-examination after the VPS decrease was approved. [ER 4, p.74, ¶2] The full and complete text of the notice was presented in the Introduction/Summary of Argument and will not be repeated here. The flyer, without explanation, referred to "lowered … payment standards used to determine your portion of the rent" and provided a chart showing the payment standards for

different sized units, again without explanation. The flyer suffered from a number of infirmities, including:

(1) the word "lower" with reference to the payment standard suggests, if anything, a rent reduction and is misleading;

(2) the purpose of the notice is not explained in understandable language;

(3) the term of art "payment standards" is not defined or explained, and is not a readily understandable term,, even though it appears no fewer than six times in the text;

(4) the table is confusing and misleading, and certainly does not alert the tenant that his/her share of rent would be increasing;

(5) the flyer lacks the name of a sender or an addressee and provides no information on where to go for help to understand it.

Kenneth Baldwin, an Administrative Analyst at HACLA, drafted the one-page flyer by reviewing the regulation's language. He did not consult with anyone; did not review any documents; and just referred to the federal regulations. [ER 2 at p.48:11–51:11] Baldwin (a) took no steps to analyze whether the language was understandable, (b) did not discuss the adequacy of the language with other staff; (c) did not look to other notices to obtain language that could be understandable; and (d) did not even consider whether the language would be understandable to a typical recipient. [*Id* at p.52:5-25]

23

At the same time he drafted the flyer, Baldwin also drafted a letter to <u>new</u> Section 8 voucher holders. This letter not only indicated that there would be a new VPS, but defined "VPS" in reasonably understandable language. "The Voucher Payment Standard is the most the Housing Authority can pay for a unit. If the rent for **your** unit is higher, you must pay the difference in the rent." (Original emphasis). [ER 19] In contrast, the challenged Flyer to <u>existing Section 8</u> recipients did not explain the Voucher Payment Standard, and did not explain that the effect of **lowering** the Voucher Payment Standard is to **raise** the amount paid by the tenant. This effect is counter-intuitive, i.e., the average person would likely conclude from the Flyer that s/he will have to pay less, not more. [ER 11]

There were common-sense ways to make the notice understandable, none of which were considered, including:

(1)     defining the term "VPS", and the meaning of a VPS decrease;

(2)     titling the notice more descriptively, such as "Notice of Likely Increase in Your Portion of the Rent";

(3)     providing a concrete example of the effect on a tenant's rent of a VPS decrease;

(4)     explaining that, although HACLA could not yet determine the precise effect of the change because other factors could affect it, the result of

24

the change for most people would be to increase the tenants' share of the rent; and

(5)    personalizing the flyer with the tenant's name.

The VPS decrease went into effect with reexaminations that occurred from July 2005 through July 2006. [ER 5, p.82, Section C.1] HACLA estimated that some 45% of its approximately 45,000 Section 8 participants would be adversely affected, and would have to pay an average of $104 more in rent each month if they remained in their current units. Of this number, nearly 5000 were elderly families, and 4500 were non-elderly, disabled families. *Id.*

## 5.    *The Representative Plaintiffs*

### a)    **Michael Nozzi**

At the time the complaint was filed, Michael Nozzi was a totally and permanently disabled 55-year-old man (due to HIV/AIDS). [ER 1, p.9, ¶32, ER 16, p.130] Nozzi has received a Section 8 housing benefit since December 1, 2003. [*Id* at ¶33, ER 16, p.130] His personal rent obligation went from $231.00 per month to $342.00 per month (a 48% increase amounting to $111 per month). [*Id* at ¶¶33, 34, ER 16, p.130] Nozzi did not recall ever seeing the initial HACLA Flyer. [ER 16, p.130] When he did learn that his benefits would be reduced, Nozzi appealed the increase through counsel, and requested a hearing. None was provided. [ER 1, p.10, ¶35, ER 16, p.130]

25

At the time he reviewed the flyer in 2006, Nozzi could not understand it. Specifically, he did not understand the meaning of HACLA having "lowered the payments standards used to determine your portion of the rent"; did not understand how it would affect his rent, i.e., whether it would be "lowered" or increased; and did not understand the purpose of the table. [ER 16, pp.130, 131]

### b)    Nidea Pelaez

Ms. Pelaez submitted a declaration in opposition to the first summary judgment, and another in opposition to the second. In the first, she explained that, at the time of the complaint's filing, she was a single parent, receiving CalWORKS benefits, and Social Security Survivor's Benefits on behalf of her daughter. [ER 1, p.10, ¶36; ER 17, p.135] Pelaez's Section 8 personal rent obligation was increased from $91.00 to $252.00 per month (a 177% increase). [ER 1, p.10, ¶37; ER 17, p.135] Like Nozzi, Pelaez did not recall ever seeing the HACLA Flyer with her annual reexamination packet. [ER 17, p.135] When Ms.  Pelaez did eventually learn that her rent contribution would increase substantially, she requested (through counsel) and received a hearing, but no decision had been rendered as of the time of the first summary judgment [ER 1, p.10, ¶38; ER17, p.135]

At or about February 2006 when she first reviewed the Flyer, Pelaez did not understand what the flyer was attempting to convey; did not understand what HACLA having "lowered the payments standards used to determine your portion

26

of the rent" meant; did not understand the effect of the change on her rent; and did not understand the relevance of the table. [ER 17, p.135][9]

In her second Declaration filed in response to Defendants' second summary judgment motion, Ms. Pelaez explained that she had "no understanding of what information it [the notice] was attempting to convey"; did not understand at all… that the maximum amount that HACLA would pay for my rent would be going down (leaving me with a higher portion of the rent)"; that she did not recall ever having the concept of VPS previously explained to her or of understanding before 2006 what this term meant; and that she did not recall ever attending a group session when she became a Section 8 tenant. [ER 53] In addition, Ms. Pelaez verified that, in 2009, she received the notice attached as Ex. 27 to the Declaration of Barrett S. Litt. [ER 52] That notice used language that, though still confusing, was an improvement on the challenged notice (although not as clear as the language cited in Section IV(E)(4), *supra*. Compare notice language in ER 19 with that in ER 53)

---

[9] The District Court struck this evidence on the ground that what the Plaintiff thought after the fact was irrelevant. Although the Court gave no reason, relevance was the one given by Defendants in their objection. [ER 20, p.157] The District Court was wrong on two grounds. First, the fact that Ms. Pelaez did not see the notice until 2006 is evidence that she did not notice it buried in the stack of papers mailed to her. Second, it shows that, even if she had seen it, she would not have understood it.

## VI.   PROCEDURAL HISTORY

Because of the need to explain the issues in the context of the case's

developments over nearly 10 years, the procedural history through the first appeal

is contained in Section IV(A) (Initial 2009 Appeal And The Ninth Circuit's

Reversal Of The Trial Court – Including Procedural History Through First

Appeal), and will not be repeated here.

After remand, Defendants filed a renewed motion for summary judgment on

the very same claims the Ninth Circuit had earlier reversed the trial court. [ER 39]

On June 6, 2013, the trial court granted Defendants' renewed motion in its entirety.

[ER63]

## VII.   STANDARD OF REVIEW

An order granting or denying summary judgment generally is reviewed *de*

*novo*. *See, e.g., Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). The

standard of review on an evidentiary ruling is abuse of discretion. *See, e.g.,*

*Fonseca v. Sysco Food Serv., Inc.,* 374 F.3d 840, 845 (9th Cir. 2004). The law-of-

the-case is a discretionary doctrine. *Merritt v. MacKey*, 932 F.2d 1317, 1320 (9th

Cir. 1991). That discretion, however, is not unfettered. *Thomas v. Bible*, 983 F.2d

152, 155 (9th Cir. 1993). The prior decision should be followed unless: "(1) the

decision is clearly erroneous and its enforcement would work a manifest injustice,

(2) intervening controlling authority makes reconsideration appropriate, or (3)

28

substantially different evidence was adduced at a subsequent trial." *In Re Rainbow Magazine, Inc.*, 77 F.3d 278, 281 (9th Cir. 1996).

## ARGUMENT

## I. THE PRIOR PANEL DECISION ON THE DUE PROCESS AND 815.6 CLAIMS IS LAW-OF-THE-CASE AND CONTAINS THIS COURT'S MANDATE, REQUIRING REVERSAL ON THESE CLAIMS.

### A. THE HOLDING THAT GENUINE ISSUES OF MATERIAL FACT PRECLUDED SUMMARY JUDGMENT AND REMANDING WITH DIRECTIONS BOUND THE LOWER COURT WHEN ADDRESSING SUMMARY JUDGMENT ON THE SAME FACTUAL RECORD.

"Under the law-of-the-case doctrine a decision of the court in a prior appeal must be followed in all subsequent proceedings in the same case." *Eichman v. Fotomat Corp.*, 880 F.2d 149, 157 (9th Cir. 1989). The doctrine "'encompasses a court's explicit decisions as well as those issues decided by necessary implication.'" *Id.* (quoted citation omitted).

"'The rule of mandate is similar to, but broader than, the law-of-the-case doctrine.'" *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067(9th Cir. 2012) (quoting *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995)). "A District Court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it." *Id.* "Violation of the rule of mandate is a jurisdictional error." *Id.*

Accordingly, the holding that genuine issues of material fact require reversal of a summary judgment is law-of- the- case, preventing the grant of a renewed

29

summary judgment motion on the same factual record. (The only exceptions would be if the prior decision was clearly erroneous or there was an intervening change in law. *Eichman, supra*,). In reviewing a summary judgment, the Court of Appeals, like the District Court, considers the "entire record." *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 543 (9th Cir. 1975). Since summary judgment may be affirmed on any ground supported by the record, *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 860 n.17 (9th Cir. 1995), the material issues of fact holding below includes "by necessary implication" the conclusion that the record on appeal did not support summary judgment. *See Eichman*, 880 F.2d at 157.

The Court of Appeals specified the scope of its mandate by stating 1) that the *Mathews* factors "shall [be] appl[ied[] to the circumstances presented here"; 2) that there were issues of material fact exist as to "whether the notice HACLA provided satisfied …due process"; and "as to whether HACLA's notice sufficiently protected Plaintiffs' property interest"; and 3) because the "regulations 'closely circumscribe' HACLA's discretion" and require "HACLA to inform participants that a reduced VPS will be implemented," Plaintiffs' "property interest is protected against an abrupt and unexpected change in benefits." *Nozzi*, 425 Fed. Appx. at 541.

30

**B.**    THE DISTRICT COURT IMPROPERLY GRANTED SUMMARY JUDGMENT ON PLAINTIFFS' FEDERAL AND STATE DUE PROCESS CLAIMS.

*1.    The Remand Required Recognition That There Were Disputed Issues Of Fact Regarding Whether HACLA's One-Year VPS Reduction Notice Satisfied Plaintiffs' Due Process Rights.*

In its previous decision, this Court reversed the grant of summary judgment on Plaintiffs' federal and state due process claims, and agreed that the regulatory requirement of advance notice of a reduced VPS is a component of Plaintiffs' property interest. 425 F. App'x at 541. This Court agreed with Plaintiffs that the "statute in tandem with the regulatory requirements 'restricting the discretion' of HACLA…creates a property interest in Section 8 benefits to which constitutional due process attaches" and concluded:

"Because the Section 8 regulations "closely circumscribe" HACLA's discretion – by prohibiting HACLA from immediately implementing a reduced VPS, and requiring HACLA to inform participants that a reduced VPS will be implemented – Plaintiffs' property interest is protected against avoiding an abrupt and unexpected change in benefits." 425 F. App'x at 541.

The Court distinguished *Atkins v. Parker*, 472 U.S. 115 (1985) because there "the Plaintiffs had no *property interest in advance notice of congressional action.*" *Id.*, fn.1 (emphasis supplied).

This Court directed the District Court to apply the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *Id.* The prior opinion was clear

31

that summary judgment on the due process claims was inappropriate on the record

before it – essentially the same record as that for the second summary judgment.

   2.    *HACLA's Renewed Summary Judgment Motion Invited The District Court To Violate The Law-of-the-Case Doctrine And This Court's Mandate.*

Nonetheless, on remand, HACLA filed a renewed motion for summary

judgment on Plaintiffs' due process claims expressly relying on *the same evidence*

that this Court held raised material issues of fact precluding summary judgment.

*See*, *e.g.*, HACLA's renewed SJ Motion [ER 39, p.395] (citing  Agbor, Fields and

Dveirin declarations, the [Proposed] Statement of Uncontroverted Facts and

Conclusions of Law, all of which, HACLA explained "were filed concurrently

with HACLA's prior motion for summary judgment"); [*id*., p.408] (citing

"HACLA's prior summary judgment motion and the prior [Proposed] Statement of

Uncontroverted Facts and Conclusions of Law").

HACLA argued that this prior record "establish[ed] all that is necessary" for

the Court to grant it summary judgment on the ground that it "provided sufficient

notice and opportunity to be heard … to meet each of the *Matthews* factors." [*Id*.,

p.408]. It similarly argued that it demonstrated "in its prior summary judgment

motion*"* its "extensive steps to ensure that everyone knew about the reduction in

the VPS" by training Section 8 recipients, sending notices, and holding hearings.

[*Id*., pp.414-415]

32

HACLA also claimed that, following this Court's decision, Plaintiffs made "admissions" entitling HACLA to summary judgment, such as Plaintiffs' agreement that the specific effect of the VPS reduction on individual beneficiaries could not be determined a year in advance, a position always agreed to by Plaintiffs. [ER 39, p.403] But that "concession" was part of the prior appellate record. *See* [ER 28; ER 25, pp.214, 215; 231; 238-239]

Instead of presenting new or different evidence, HACLA's renewed summary judgment motion attempted to re-write the law-of-the-case and this Court's mandate. In its previous decision, this Court *rejected* the District Court's conclusion that "Plaintiffs asserted no property interest to which due process attached" and concluded that Plaintiffs had a "well-settled property interest in their Section 8 benefits," and that the Section 8 statute "*in tandem with the regulatory requirements 'restricting the discretion' of HACLA [citation] creates a property interest in Section 8 benefits to which constitutional due process attaches*." 425 F. App'x at 541 (citation omitted, emphasis added); see also *id*. (Section 8 regulations "'closely circumscribe'" HACLA's discretion by "requiring HACLA to inform participants that a reduced VPS will be implemented" and prohibiting HACLA from immediately implementing a reduced VPS; "[t]echnical compliance with regulatory procedures does not automatically satisfy due process requirements").

In direct contravention of this Court's holding, HACLA's renewed summary judgment motion claimed that Plaintiffs "have *little if any due process interest* in a year's worth of notice of a reduction in the VPS, and so even minimal notice is more than sufficient" and that because "the notice of the VPS reduction met HUD's requirements, the notice certainly meets that minimal [notice] threshold." [ER 39, p.413](emphasis added). Moreover, HACLA claimed that Plaintiffs' receipt of a *separate* notice 30 days before the VPS reduction took effect – the "RE-38 notice" – provided constitutionally adequate due process. [*Id*., pp.401-403; 407-412] Alternatively, and also in conflict with this Court's directive, HACLA argued that the entire notice and hearing procedure for reducing the VPS satisfied Plaintiffs' due process rights. [*Id,*. pp.414-416]

### 3. *The District Court Violated The Law-of-the-case Doctrine And This Court's Mandate By Granting HACLA's Renewed Summary Judgment Motion On Plaintiffs' Due Process Claims.*

The District Court acknowledged that Defendants' renewed summary judgment motion relied on the "statement of undisputed facts ('SUF') …prepared in connection with their previous summary judgment motion").[10] [ER 63, fn.3,

---

[10] In Fn. 10, the District Court also cited *Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010) (district court has discretion to permit "'successive motions for summary judgment . . . *on an expanded factual record*.'"). Ruling at 9 (emphasis added). Even if *Hoffman* were apposite, which it is not because this was not "expanded" but the same record, *see, e.g.* [ER 63, fn.3, p.887], *Hoffman* did not involve an intervening Court of Appeals decision that created law-of-the-case.

p.887]. Contrary to this Court's mandate to determine whether HACLA's one-year VPS reduction notice "sufficiently protected Plaintiffs' property interest" in Section 8 benefits, 425 F. App'x at 542, the District Court considered it "myopic" to focus on the challenged advance notice. It instead applied the *Mathews* factors to "the entire process preceding the actual reduction of Plaintiffs' Section 8 benefits" and concluded that "undisputed facts show that HACLA *did* provide adequate notice") (original emphasis). [ER 63, pp.895-898].

The court acknowledged that the first *Mathews* factor – the private interest at stake – favored Plaintiffs. [ER 63, p.898] ("any reduction in Section 8 benefits could have a significant impact on Plaintiffs."). According to the District Court, the second *Mathews* factor – the risk of an erroneous deprivation – favored HACLA "in light of the entire process provided to Plaintiffs." [ER 63, p.898]. That determination ignored Plaintiffs' substantial interest in effective advance notice. Citing evidence in the record of the first summary judgment, it reached several conclusions contrary to the mandate. It found that "Plaintiffs…received one year's advanced *notice* of the potential for a future reduction in benefits" while this Court remanded because it was a disputed issue whether that notice was adequate. [ER 63, p.899] (original emphasis). It found Plaintiffs "were *trained* on how to understand this notice, interpret the documents therein, and informed of the ways in which Defendants would determine the amount of housing assistance payments

35

for a given family," all of which was in dispute both because the Plaintiffs'
Declarations disputed it and because Plaintiffs had not had the opportunity to
complete discovery and contact other putative class members to address these
issues. [ER 52]. The District Court found that the "plain language in the VPSA
Reduction Notice belies Plaintiffs' argument that the notice was not drafted in a
way 'that a [reasonable] resident would understand'", [ER 63, p.899], again in
direct contravention of the mandate.

The District Court considered it "crucial[]" that, "until the new lower VPS is
applied a year later, Plaintiffs admit that it is impossible to determine how the VPS
decrease will affect participants", [ER 63, p.899], although this was never in
dispute and was argued in the prior summary judgment proceeding and appeal. See
[ER 28; ER 25, pp.214, 215; 231; 238-239] Again in contravention of the mandate
and of the whole rationale for the regulation's requirement of advance notice, the
District Court concluded "[t]here would be minimal value in requiring HACLA….
to safeguard against an erroneous deprivation of …Section 8 benefits that were, at
the time of the one-year VPSA Reduction Notice, incalculable." [ER 63, p.899].

The District Court found that the third *Mathews* factor – the Government's
interest – favored HACLA, again ignoring Plaintiffs' substantial interest in
advance notice. It determined that HACLA fulfilled its due process obligations
through "the procedures afforded to Plaintiffs before any actual reduction in their

36

Section 8 benefits took place . . . ." [ER 63, p.901]. Nowhere did the Court address the law-of-the-case doctrine, much less explain why it was inapplicable, although Plaintiffs raised it. [ER 60, pp.791, 808-810]

HACLA cannot evade the law-of-the-case doctrine by arguing, as it did below, that this Court did not address evidence presented in the previous appeal – and cited in HACLA's original appellate brief – concerning HACLA's "additional notification efforts." [ER 42, pp.526-527; *see* ER 28; ER 25, pp.214, 215; 231; 238-239] The law-of-the-case doctrine precludes reconsideration of an issue decided "explicitly *or by necessary implication* by the same court or by a higher court in the identical case." *Hall*, 697 F.3d at 1067.  Appellate review of summary judgment necessarily means that the court considered the entire record, *See Radobenko*, 520 F.2d at 543.

On remand, absent exceptions not applicable here, this Court's decision has law-of-the-case effect. Additionally, the District Court fundamentally misconstrued this Court's mandate, which required a determination of whether the **challenged advance notice** met due process standards, and did not permit the District Court to re-frame the relevant inquiry.

37

### C. THE DISTRICT COURT VIOLATED THE LAW-OF-THE-CASE DOCTRINE AND THIS COURT'S MANDATE BY GRANTING HACLA'S RENEWED MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM FOR VIOLATION OF GOVERNMENT CODE § 815.6.

This Court similarly concluded that there were disputed issues "whether the 'literal compliance' [with 24 C.F.R. §982.505] that occurred here was sufficient to meet §815.6's requirements" because "the notice must be sufficiently effective to protect housing benefits recipients." 425 F. App'x at 542 (9th Cir. 2011). Defendants again argued for summary judgment on the precise same set of facts. [ER 39, p.417] (admitting record was the same). HACLA asserted that the District Court had not previously considered its evidence because the Court believed "the VPS notice clearly met the regulatory requirements." *Id*.  They contradictorily observed that "the prior ruling... noted" that the Agbor and Baldwin declarations "provided unrebutted evidence" that the challenged notice "was not confusing to Plaintiffs because they were familiar with the term 'Voucher Payment Standard' and with the payment standard chart contained in the notice." [*Id*., p.418] The District Court ruled that the challenged notice "was sufficiently effective to protect Section 8 recipients from an abrupt and unexpected reduction in their benefits" based on "the totality of the information provided by Defendants." The court therefore improperly dismissed this Court's remand and granted summary judgment on Plaintiffs' Government Code §815.6 claim. *Id*.  As with the due

process claim, it failed to address disputed evidence, or Plaintiffs' inability to

investigate or conduct discovery from putative class members.

## II. THE DISTRICT COURT GRANTED SUMMARY JUDGMENT ON PLAINTIFFS' NEGLIGENCE CLAIM IN VIOLATION OF THE LAW-OF-THE-CASE DOCTRINE AND THIS COURT'S MANDATE.

In its previous decision, this Court reversed the dismissal of Plaintiffs' state

law negligence claim because the District Court erroneously concluded that

California law did not allow vicarious liability for the negligent acts of its

employees. *425 F. App'x at 542.* While this holding did not directly address the

duty of care issue, the reversal of the due process and 815.6 summary judgments

necessarily applies to the negligence claim as well. The due process and 815.6

claims were reversed because it was disputed whether the notice reasonably and

effectively met due process standards and "protect[ed] housing benefits recipients

from an abrupt and unexpected reduction in benefits." *Id*. Since the duty of care at

issue here was the duty to so protect such recipients, those holdings necessarily

meant that there was a disputed issue of fact whether Defendants beached their

duty of care to the affected Section 8 recipients. The District Court agreed to this

framing of the duty of care, finding that Defendants "did not breach the duty they

owed to Plaintiffs to provide 'sufficiently effective' notice to guard against an

abrupt and unexpected reduction in their Section 8 benefits." [ER 63, p.903] Thus,

the negligence ruling also violated the law-of-the-case doctrine.

39

## III. THE DISTRICT COURT ERRED IN ITS DUE PROCESS ANALYSIS AND EVALUATED IRRELEVANT EVIDENCE[11]

### A. THE DISTRICT COURT MISCONSTRUED THE PROPERTY INTEREST

As explained in Argument I(B)(1), this Court found that the Section 8 statute, "in tandem" with the regulations, which "closely circumscribe[d]' HACLA's discretion", created a property interest that was "protected against an abrupt and unexpected change in benefits" and thus triggered due process requirements. The Court distinguished *Atkins v. Parker*, 472 U.S. 115 (1985) because there "the Plaintiffs had no *property interest in advance notice of congressional action*", 425 F. App'x at 542, fn.1 (emphasis supplied), in contrast to Plaintiffs' property interest here that included advance notice, and that such advance notice was a conferred benefit that allowed Section 8 tenants to adjust their lives to the decrease in benefits.

The significance of the protection provided by 24 C.F.R. §982.505 and §815.6 – individually and in combination with the underlying Section 8 statutory scheme s – was not appreciated by the District Court in granting either of its summary judgments. Because the tenant has an enforceable property right and right of action in the regulation, the regulation, or the regulation in combination with the relevant federal and state statutes, creates a property interest in advance

---

[11] In an excess of caution, Plaintiffs largely repeat in Arguments III-V, in abbreviated form, arguments made in the prior appeal and adopted (at times with less specificity) in the Circuit opinion.

notice subject to due process protection. Thus, Plaintiffs had a right to the existing voucher payment standard until at least one year after receiving effective notice, *i.e.*, notice that comports with due process, of an adverse change. The length of time (one year) before a decreased VPS could take effect was a tangible material benefit conferred on Plaintiffs.

Because the advance notice requirement ensures that the person will have an unchanged benefit for at least a year after receiving effective notice, the tenancy and the one year advance notice of a reduction are inextricably intertwined to create a **property interest in unchanged governmental support for at least one year after receiving notice of a reduction**. There is unquestionably a greater tangible benefit in continuing governmental support until at least one year after notice of a reduction – even if the precise amount is not specified – than simply until notice of a reduction. Support for an additional year is obviously of greater value, and translates into more dollars and cents in benefits to the tenant. The District Court wrongly analyzed the due process issue from the premise that there was no tangible benefit to the tenant from the advance notice provision.

By adopting its "totality of the circumstances" approach, the District Court essentially concluded that 24 C.F.R. §982.505 was irrelevant under both a due process and 815.6 analysis. The District Court was clearly of the view in both summary judgment rounds that due process standards did not apply separately to

41

the one year advance notice requirement of the regulation. The regulation's one year guarantee may be unusual, perhaps unique, but all the more reason to ensure its protections are made meaningful. It is, after all, beyond dispute that shorter notice requirements trigger due process protections.[12]

The cases cited in Fn.11 finding enforceable notice due process rights in notice are buttressed by those holding that, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures….even where the internal procedures are possibly more rigorous than otherwise would be required." *Morton v. Ruiz*, 415 U.S. 199 (1974) (BIA had to comply with its own regulations regarding publication of notice of a change in benefit criteria before it could extinguish the entitlement of otherwise eligible beneficiaries). The seminal case is *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954). In

---

[12] Notice provisions usually give time to file a claim or appeal contending that the change does not properly apply to the individual; they don't usually extend benefits for a lengthy time period as is true here. *See, e.g., Kimble v. Solomon*, 599 F.2d 599 (4th Cir.) (prospective relief for violation of Medicaid regulation's notice provisions; 10 day notice requirement of regulations violated when notices sent to Medicaid recipients after effective date of a curtailment in coverage; Maryland had "not instituted a legally effective reduction in its Medicaid benefits" because it failed to "comply with the notice regulations"); *Rochester v. Baganz*, 479 F.2d 603 (3rd Cir.1973) (notice regulations violated when state implemented an across-the-board 11.7% reduction in AFDC benefits without providing required 15 days advance notice to recipients); *Budnicki v. Beal*, 450 F.Supp. 546, 552 (E.D.Pa.1978) (notice regulations violated when state eliminated orthopedic shoes as a Medicaid benefit without 10 day advance notice to all Medicaid recipients because "each [recipient] had the right to receive such benefit before the change was effectuated."). Nonetheless, even in such short notice situations, regulations create enforceable rights in proper notice.

42

*Accardi*, "the Supreme Court vacated a deportation order of the Board of Immigration Appeals because the procedure leading to the order did not conform to the relevant regulations. The failure of the BIA and of the Department of Justice to follow their own established procedures was held a violation of due process." *U.S. v. Heffner*, 420 F.2d 809, 811-812 (4th Cir. 1969).[13]

Although regulation enforcement cases do not couch the issues in terms of whether a property interest exists, they show that notice or other rights embedded in a regulation meet the property interest criteria set out in *Roth*, *i.e.*, that a "property interest in a benefit" exists where one has "a legitimate claim of entitlement to it", which interest is created by "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." That analysis has been applied even to short notice requirements of 10 or 15 days, much less the one year guarantee involved here. See cases cited in Fn.10. Thus, this Court concluded that the property interest here was "protected against an abrupt and unexpected change in benefits." *Nozzi*, 25 F. App'x at 541. *See also Kimble, supra* at Fn.10 (purpose of the notice requirement, as explained by the Secretary of Health, Education and Welfare, was that, "recipients ought to be informed in

---

[13] These and similar cases were cited approvingly in *Alcaraz v. I.N.S.*, 385 F.3d 1150 (9th Cir. 2004), which noted that, "[a]lthough the doctrine has its clearest origin in … *Accardi…,*which dealt with published regulations, courts have recognized that the so-called *Accardi* doctrine extends beyond formal regulations."

advance if their payments are to be cut for any reason, so that they may be able to plan for the cut, and to the extent possible adjust to it").

The District Court's "totality of the circumstances" analysis failed to recognize that the notice right provided by the regulation was a substantive right in advance notice. The effect of this approach was to view 24 C.F.R. §982.505 as a technicality, conferring no meaningful benefit, instead of what it was – a guarantee of a continuing government benefit for a substantial time after meaningful and effective notice of an adverse change. Since the regulation's entitlement included a continuing benefit for a year after notice, and this combination constituted a property interest, the Plaintiffs were entitled to notice that met due process standards. Thus, HACLA had to follow procedures that complied with due process in effectuating the changes authorized by the regulation.

### B. THIS COURT'S PRIOR OPINION REFERS ONLY TO THE INITIAL NOTICE SENT ONE YEAR BEFORE THE VPS REDUCTION

The initial notice was and is the sole notice challenged by Plaintiffs and addressed in the appellate opinion. On multiple occasions, this Court referenced "the notice" or "HACLA's notice" sent one year prior to the VPS decrease as the object of the due process analysis. Nothing in the opinion supports the contention that the *Mathews v. Eldridge* factors be applied to HACLA's entire notice and hearing procedure for lowering the VPS. Recasting the inquiry as one into all events preceding the VPS decrease undermined the whole import of Plaintiffs'

44

challenge and, were it the basis of the appellate opinion, could and presumably would have resulted in affirmance of the previous summary judgment grant.

### C.    THE TRIAL COURT FAILED TO PROPERLY APPLY THE *MATHEWS V. ELDRIDGE* FACTORS

This Court's opinion remanded the case with instructions to apply *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), to the circumstances here. *Mathews* makes clear that due process is "flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The relevant factors are the private interest affected, the risk of an erroneous deprivation with the procedures used, and the Governmental interest involved. While the "general rule [is] that individuals must receive notice and an opportunity to be heard before the Government deprives them of property," *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53, 114 S.Ct. 492, 501 (1993), there are exceptions.

Plaintiffs have consistently maintained that this case presented an exception to a full hearing requirement. Because HACLA was entitled to initiate an across the board VPS reduction, and the actual individual reduction in benefits could not be determined a year in advance, due process did not require a hearing right based on the advance notice; that would be triggered when notice of specific individual rental changes was sent 30 days before they took effect. However, because the regulatory provision was designed to provide added protections and time for

45

tenants to adjust, due process required meaningful, effective and understandable notice of the change to come, and its general impact.

Thus, the minimum process due was that the initial notice should have communicated that HACLA's contribution to Section 8 tenants' rents was going to go down; that, unless some other factor came into play in the individual case, this would mean the tenants' contribution to his/her rent would rise in a year; and that tenants should plan accordingly. Since Plaintiffs' property interest included protection from "an abrupt and unexpected change in benefits", Plaintiffs were due such adequate and effective notice a year in advance. Adequate and effective notice 30 days in advance did not, and could not, cure that defect.

In addition, the prior opinion made clear that Govt. Code §815.6, aside from due process considerations, at a minimum required that "the notice must be sufficiently effective to protect housing benefits recipients from an abrupt and unexpected reduction of benefits." *Id*.

### D. DEFENDANTS' ALLEGED EVIDENCE OF POST-NOTICE "OUTREACH" AND EDUCATION EFFORTS IS IRRELEVANT GIVEN THE DEFINITION OF THE PROPERTY INTEREST ARTICULATED IN *THE PRIOR OPINION*.

HACLA's alleged evidence of *post-hoc* outreach efforts, including a more detailed notice 30 days before the VPS decrease took effect, was part of the summary judgment record in the prior appeal. In Defendants' original appeal brief, they argued that HACLA conducted outreach and education subsequent to sending

46

the single-page flyer. *See* [ER 25*, pp.*215-219] This Court could have decided that these subsequent efforts cured any defect in the mandated one-year notice and affirmed summary judgment. It did not. In fact, the panel, which conducted a *de novo* review, could have affirmed "on any basis supported by the record", *Burrell v. McIlroy,* 464 F.3d 853, 855 (9th Cir.2006). *See also,* e.g., *Davis v. United States,* 589 F.2d 446, 448 n.3 (9th Cir.1979) ("Even if we disagree with the district judge's reasoning, we may nevertheless affirm his disposition 'on any ground squarely presented on the record.' " (quoting *Grosz v. Andrus,* 556 F.2d 972, 974 n.3 (9th Cir.1977)); Rutter Guide, 1 Fed. Appellate Prac. Guide Ninth Cir. 2d §8:11.

Leaving aside whether HACLA's outreach efforts are relevant given the holding that the one-year statutory notice must comport with due process, it is a triable issue of fact whether HACLA's outreach and education were effective, reached any meaningful number of class members, were comprehensible to the average Section 8 tenant, and whether, in any event, the notice provided comported with due process standards.[ER 51, p.629] Defendants' own evidence belies the idea that such "outreach" was efficacious. Indeed, Defendants' Exhibits produced for their original Motion for Summary Judgment, reproduced for their renewed motion and submitted as part of their previous record on appeal, include excepts from the public hearing that demonstrate that only 105 Section 8 participants actually attended the seven regional meetings.  [Dkt. 74]; [ER 26, p.262];

47

Defendants Renewed MSJ [ER 39].   There is no evidence that these participants were among those who would have been affected by the VPS decrease and, in any event, to suggest that outreach to 105 participants out of an estimated 18,000-22,500 affected Section 8 tenants could ever be sufficient is risible. [14]

Furthermore, slides produced by HACLA and replicated in their prior appellate excerpts of record, and again as part of their renewed motion,  clearly demonstrate that the VPS reduction was only one of many different topics covered in the presentation which also included minimum rent changes, moving and portability conditions, and criminal background and credit checks. Defendants' Appendix of Exhibits in Support of Defendants' MSJ [Dkt. 74, pp.63-65]; [ER 27].

As this Court concluded, these are all disputed issues for the trier of fact. Discovery on these issues – at least as it relates to class members – had not even begun. See Section IV (C) (Statement of Facts – Post Remand Discovery).

### E.    *ROSAS* IS INAPPLICABLE

The District Court indicated that *Rosas v McMahon*, 945 F.2d 1469 (9th Cir. 1991), appeared to be "at odds with" the prior opinion. [ER 63, fn.9, p.893]. Defendants relied on *Rosas* for the proposition that Plaintiffs do not have a due process right to a "period of grace." In *Rosas*, Congress had amended the Aid to Families with Dependent Children (ADFC) program to increase the kinds of

---

[14] The figure of 105 participants means that one in 172 Section 8 participants attended such meetings, around 0.005% of those affected.

48

household income deemed available to a child. Plaintiffs there contended that a regulation stating that 10 days' notice had to be provided before benefits could be reduced meant they were entitled to such notice 10 days before the change took effect, whereas Defendants contended that notice had to be provided 10 days before the actual change in an individual's benefits. *Id.* at 1471-1472. The notice did not have to be given 10 days before the effective date of the change in the law, primarily because the Secretary of State's interpretation of his own regulation was not plainly erroneous or inconsistent with the regulation's terms. *Id.* at 1472-73.

Regarding Plaintiffs' argument of entitlement to a "period of grace," the Court held that "no due process requirement of a 'grace period' is appropriate to *limit Congress's ability to adjust the level of benefits* under its AFDC program." *Id.* at 1474 (emphasis supplied). Congress could "alter, amend or repeal" any provision of the statute governing the AFDC program. A "welfare recipient is not deprived of due process when the legislature adjusts benefit levels." *Id.* at 1475.

This case differs dramatically from *Rosas*. First, Congress is empowered to change the law, while agencies are not. Second, Plaintiffs are not claiming any general due process right to a grace period, as the *Rosas* plaintiffs essentially were. Rather, Plaintiffs here have a property interest that encompasses advance notice as a result of the statute and regulation. Unlike *Rosas*, where Congress had a right to

49

change the law, HACLA could not, and did not purport to, alter the statute or HUD regulations.

Unlike here, *Rosas* involved no legal requirement of an advance notice period so that recipients would have time to plan and prepare for the change, even though the *Rosas* court recognized that such a requirement might be desirable. *Id.* at 1475 ("The sudden reduction in entitlements, the complexity of the reductions, and the administrative delay in implementing them, served neither the recipients nor the public interest well."). Here, by contrast, HACLA was legally *required* to provide notice one year in advance of the actual reduction in benefits. HUD extended the regulation's draft notice requirement from tenants who had received Section 8 benefits for less than two years to all Section 8 tenants. This reflected a considered decision to provide increased protection before implementing an adverse benefits change. See, e.g.,  [ER 6, pp.95, 96] HUD, acting within its regulatory authority, made the judgment that Section 8 recipients should have such a one-year notice. The issue before the Court is whether, given that requirement, HACLA's notice met due process standards. As such, the trial court's reliance on *Rosas* is misplaced.

## IV.    THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT ON PLAINTIFFS' §815.6 CLAIM

Before lowering the VPS, Public Housing Authorities ("PHAs") such as HACLA must comply with a very specific timeline relating to notice. A PHA must

50

provide proper notice to a recipient whose benefits are being reduced at the first

annual re-examination following the change in services. 24 C.F.R.

982.505(c)(3)(ii). The actual reduction in benefits cannot occur until one year after

this notice, upon completion of the second re-examination after the effective date

of the decision to decrease the level of services. *Id*. Thus, HACLA's ability to

reduce the VPS is constrained by the requirement that it provide proper notice one

year in advance. There is no room for agency interpretation or discretion.

In the summary judgment proceedings preceding the *first* appeal, the trial

court concluded that recitation of the literal language of the regulation, 24 C.F.R.

§982.505, was sufficient to satisfy due process. [ER 20, p.169] However, this

Court indicated that "[t]echnical compliance with the regulatory procedures does

not automatically satisfy due process requirements"; the trial court's conclusion to

that effect was "at odds with *Mathews*." 425 Fed. Appx. at 542. The notice must

communicate to the reasonable Section 8 tenant that his housing subsidy may

decrease in the following year.[15] This Court was unequivocal that whether the

---

[15] Defective notice is no notice, and language incomprehensible to a reasonable
person is defective. *See, e.g., David v. Heckler*, 591 F. Supp. 1033 (D.C.N.Y.
1984) (Weinstein, J.) (use of "bureaucratic gobbledegook, jargon, double talk,
form of officialese, federalese, insurancese, and doublespeak" insufficient);
*Butland v. Bowen,* 673 F.Supp. 638, 642 (D.Mass. 1987) ("misleading notice
violated plaintiff's right to due process of law"); *Mullane v. Central Hanover*, 339
U.S. 306, 315 (1950) (notice must be phrased "reasonably to convey the required
information"); *Frank v. Kizer*, 213 Cal. App. 3d 919 (1989) (notice must be
"phrased in language that a typical recipient …[would] understand"); *Billington v.*

51

notice provided was effective is a "question of fact." *Id*. Disputed questions of fact, by definition, are inappropriate for summary judgment.

This Court defined the mandatory duty under §815.6 as the "duty in §982.505 to provide one-year notice before implementing the reduced VPS" and noted that, "[a]t a minimum, the notice must be sufficiently effective to protect housing benefits recipients from an abrupt and unexpected reduction of benefits." *Id*.

While the trial court did not expressly rely on its previous technical compliance argument in ruling on the second summary judgment motion, its analysis suffers from the same infirmities. By minimizing the importance of the timing of the notice (as mandated in §982.505), and relying on the "totality of the information provided," it effectively eviscerated Plaintiffs' due process and Govt. Code §815.6 rights. [ER63, p.16] See discussion at Arguments I(B), III.

That this Court correctly concluded that Plaintiffs were entitled to protection under 815.6 is confirmed by a brief review of 815.6's requirements. Under §815.6, public entities are directly liable for violation of an enactment if the enactment imposes a mandatory duty designed to protect against the kind of injury suffered. Violation of an enactment gives rise to damages liability regardless of whether the

---

*Underwood*, 613 F.2d 91, 94 (5th Cir. 1980) (notice that "merely parrots the broad language of the regulations" is inadequate). Plaintiffs do not fully repeat their arguments in Nozzi I regarding why the notice was defective, which are at pp.25-35 of the Nozzi I Opening Brief. [Dkt. 13-1]

underlying enactment grants a private right of action or is self-executing. *Haggis v. City of Los Angeles,* 22 Cal.4th 490, 499 (2000). An "enactment" includes "a constitutional provision, statute, charter provision, ordinance or *regulation.*" *Cal. Govt. Code* §810.6 (emphasis supplied). The definition of "regulation" specifically includes "a rule, regulation, order or standard, having the force of law, adopted by an employee or agency of the United States pursuant to the federal Administrative Procedure Act." *Cal. Govt. Code* §811.6. Thus, a HUD regulation qualifies as an enactment.

The combination of the Section 8 statute, 24 C.F.R. §§982.505(c)(3)-(c)(4) and Govt. Code §815.6 has important impacts on the §815.6 analysis here. First, tenants have a property right, for due process purposes, in the federal regulation, *Nozzi*, 425 F. App'x at 541 (citing *Bd. of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701 (1972)), and Govt. Code §815.6 makes the elements of the regulation a directly enforceable right. Second, the statutes and regulations, singly or in combination, confer a direct right of action for violation of the regulation if certain conditions (discussed below) are met.

To avail him or herself of §815.6's protections, a plaintiff must satisfy a three-pronged test: (1) the enactment must impose a mandatory, not discretionary, duty; (2) the enactment must intend to protect against the kind of risk of injury suffered by the party asserting §815.6 as a basis for liability; and (3) breach of the

53

mandatory duty must be a proximate cause of the injury suffered. All three prongs are met here.

Whether an enactment is intended to impose a mandatory duty is a question of law. *County of Los Angeles v. Superior Court*, 102 Cal.App.4th 627, 638-639 (2002); *Guzman v. County of Monterey*, 46 Cal. 4th 887, 898 (2009). The language of §982.505 is mandatory, stating that the Housing Authority (PHA) *"shall determine"* the family's payment standard "at the first regular reexamination following the decrease in the payment standard amount." 24 C.F.R. §982.505(c)(3)(i)(emphasis supplied). The word "shall" renders an activity "mandatory" under California law. Gov't. Code §14. The regulation further requires that, where the VPS is being lowered (thus raising the tenant's share of the rent), then, at the first regular reexamination following the decrease in the payment standard, the "PHA *shall advise* the family" of the change and its deferral until the second regular reexamination following the effective date of the change. 24 C.F.R. §982.505(c)(3)(ii) (emphasis supplied).[16] The actual reduction in benefits cannot occur until one year after this notice, upon the completion of the second

---

[16] The most reasonable reading of the regulation is that the Housing Authority is to have a direct conversation with the Section 8 tenant at the first regular reexamination. The regulation does not actually speak of sending a notice; it says the Housing Authority "shall advise" the tenant of the decrease at the first regular reexamination. At a minimum, the language of the regulation makes clear that it was the Housing Authority's responsibility to ensure that the tenant received actual and meaningful notice.

reexamination after the effective date of the reduction. *Id*. Thus, HACLA's ability to reduce the VPS is constrained by the requirement that it provide proper notice one year in advance. There is no room for agency interpretation or discretion.

Similarly, the regulation was intended to protect against the kind of injury (extreme financial hardship) that a sudden change in the Section 8 tenant's rent obligations would occasion. This is evidenced by the plain language of the regulation. HUD consciously elected to apply it to all Section 8 tenants rather than just those in the first two years of their tenancy because it is a *"broader and more equitable regulatory safeguard against reductions in subsidy."* Federal Register, Vol. 65, p.42508 (July 10, 2000) (emphasis supplied); *see also* discussion at Section IV(B)(2), *supra*. The purpose of this notice requirement is facially clear: to advise recipients that they would be responsible for a higher rent payment, and to give residents a full year to make arrangements to adapt to this greater financial obligation.[17]

As to the third prong, it is self-evident that, if tenants were not provided the notice required by the regulation, or were provided it in a defective manner, that failure caused the damage, i.e., Plaintiffs were required to pay the higher share of rent without the benefit of the regulation's one year notice period.

---

[17] *See also Geneva Towers Tenants Organization v. Federated Mortgage Investors*, 504 F.2d 483 at 491 (1974) (a "rise in the cost of housing could force tenants to forego other perhaps necessary purchases and could even force some tenants to seek other less expensive housing").

Accordingly, the one-year notice provision of 24 C.F.R. §982.505 is

enforceable under §815.6.

## V.    THE DISTRICT COURT ERRONEOUSLY DISMISSED PLAINTIFFS' NEGLIGENCE CLAIM.

The trial court had originally dismissed Plaintiffs' negligence claim on the

erroneous ground that a public entity did not have respondeat superior (vicarious)

liability for the acts of its employees. 425 F. App'x at 542. It provided little

substantive analysis of negligence in the second summary judgment grant, instead

finding that, since there was no violation of Plaintiffs' due process or 815.6 rights

under its "totality of the circumstances" approach, there was no breach of any duty

owed Plaintiffs. [ER 63, pp.16-17]  Once again, this ignored the import of

Plaintiffs' right to advance notice. Since, as previously explained, Plaintiffs had

such a right, which was not honored, there was at minimum a triable issue of fact

whether Defendants breached the duty of care owed Plaintiffs.

## VI.    THE DISTRICT COURT IMPROPERLY DENIED PLAINTIFFS' RULE 56 (D) MOTION.

As explained in Section III(C), there was a phased discovery plan post-

remand. No depositions were to occur until the completion of database discovery

which ended up taking considerable time to obtain. Given the opinion of this

Court, and the discussion at oral argument that the key issue was whether

reasonable Section 8 tenants would have understood the notice, Plaintiffs wanted

56

to conduct extensive investigation to further test HACLA's claims. They requested that the Court deny the summary judgment motion on the ground that it was premature under Rule 56(d) and explained that they had not yet even received the database discovery, much less had the opportunity to engage in investigation and discovery based on it. See [ER 40, 478-482]; [ER 52] The blame for delays in production of the discovery were solely at Defendants' feet.

Although the District Court did not formally rule on Plaintiffs' Rule 56(d) objection and request for denial of the motion until discovery was completed, its grant of summary judgment constitutes error for failure to exercise discretion. *See Patty Precision v. Brown & Sharpe Mfg. Co.,* 742 F.2d 1260, 1264–65 (10th Cir.1984) (trial court's failure to rule on opposing party's Rule 56(f) affidavit prior to granting summary judgment against it reversed as a failure to exercise discretion). A *sub silentio* denial is nonetheless a denial. *See Stonum v. CCH Computax Inc.*, 34 F.3d 1073 (9th Cir. 1994) (court did not abuse discretion by denying Rule 56(f) motion *sub silentio* because plaintiff failed to show "further discovery would raise a triable issue of fact"); *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) ("by failing to address the question of qualified immunity, the District Court denied the supervisory Defendants" defense *sub silentio*).

Where a party has been diligent and the trial court denies a Rule 56(d)

objection in order to allow discovery of relevant evidence, it is an abuse of

discretion. *See, e.g., VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.,* 784 F.2d

1472, 1475 (9th Cir.1986) ("[T]he denial of a Rule 56(f) application is generally

disfavored where the party opposing summary judgment makes (a) a timely

application which (b) specifically identifies (c) relevant information, (d) where

there is some basis for believing that the information sought actually exists.

Summary denial is especially inappropriate where [as in the Tribes' case] the

material sought is also the subject of outstanding discovery requests.");

*Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck*

*Reservation*, 323 F.3d 767, 774-75 (9th Cir. 2003) (quoting *Visa*); *Handi Inv. Co.*

*v. Mobil Oil Corp.*, 550 F.2d 543, 547 (9th Cir. 1977) (abuse of discretion where

party had been unable to engage in discovery of whether all dealers receiving

competitive allowances from Mobil have loans because discovery "might well be

relevant to the issues here involved").

///

///

///

///

///

58

## VII.  CONCLUSION.

For the reasons stated above, this Court should reverse and remand for further proceedings, as requested, before a new District Court judge.

Dated February 20, 2014                Respectfully submitted,

Kaye, McLane, Bednarski & Litt, LLP
Public Counsel

By:  __/s/ Barrett S. Litt_____
     Barrett S. Litt
     Attorneys for Plaintiffs-Appellants


## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6 of the Rules of the United States Court of Appeals for the Ninth Circuit, Appellants state that they are unaware of any related cases.

 Dated February 26, 2014                Respectfully submitted,

Kaye, McLane, Bednarski & Litt, LLP
Public Counsel

By:  __/s/ Barrett S. Litt_____
     Barrett S. Litt
     Attorneys for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE

The text of this brief consists of 13,939 words as counted by the

Microsoft Word XP word processing program used to generate the brief.


DATED:  February 20, 2014                    /s/ Barrett S. Litt
                                             Barrett S. Litt

**U.S. COURT OF APPEALS DOCKET NO.  13-56223**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

MICHAEL NOZZI,
individually and as class representative,

Plaintiff(s)/Appellant(s)

vs.

HOUSING AUTHORITY
OF THE CITY OF LOS ANGELES, et al.

Defendant(s)/Appellee(s)

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
CASE NO. CV-07-00380 GW (FFMx)
[THE HONORABLE GEORGE H. WU]**

---

**APPELLANTS' STATUTORY ADDENDUM**

---

Barrett S. Litt, SBN 45527
Kaye, McLane, Bednarski &
Litt, LLP
234 East Colorado Boulevard
Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile:  (626) 844-7670
E-Mail: blitt@kmbllaw.com

Patrick Dunlevy, SBN 162722
Lisa R. Jaskol, SBN 138769
Stephanie Carroll, SBN 263698
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089
E-Mail: pdunlevy@publiccounsel.org

# TABLE OF CONTENTS

## STATUTORY ADDENDUM

**Statute**                                                                     **Page**

42 USCA §1983 - Civil Action for Deprivation of Rights………………      1

65 FR 42508-01 – Section 8 Housing Choice Voucher Program………..      2

24 C.F.R. §982.503 – Voucher Tenancy: Payment Standard Amount
                    and Schedule…………………………………….      6

24 C.F.R. §982.516 – Family Income and Composition………………      11

24 C.F.R. §982.1 – Programs: Purpose and Structure…………………      14

Cal. Gov. Code §815.6 – Mandatory Duty of Public Entity to
                    Protect Against Particular Kinds of Injuries…      16

Federal Rules of Civil Procedure Rule 56 – Summary Judgment………      17

24 C.F.R. §982.505 – Voucher Tenancy: How to Calculate Housing
                    Assistance Payment……………………………..      25

i

§ 1983. Civil action for deprivation of rights, 42 USCA § 1983

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 21. Civil Rights (Refs & Annos)
      Subchapter I. Generally

## 42 U.S.C.A. § 1983

### § 1983. Civil action for deprivation of rights

### Effective: October 19, 1996

Currentness

<Notes of Decisions for 42 USCA § 1983 are displayed in six separate documents. Notes of Decisions for subdivisions I to IX are contained in this document. For additional Notes of Decisions, see 42 § 1983, ante.>

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**CREDIT(S)**

(R.S. § 1979; Pub.L. 96-170, § 1, Dec. 29, 1979, 93 Stat. 1284; Pub.L. 104-317, Title III, § 309(c), Oct. 19, 1996, 110 Stat. 3853.)

Notes of Decisions (5294)

42 U.S.C.A. § 1983, 42 USCA § 1983
Current through P.L. 113-74 (excluding P.L. 113-66, 113-67, and 113-73) approved 1-16-14

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

65 FR 42508-01
RULES and REGULATIONS
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
24 CFR Part 982
[Docket No. FR-4586-I-01]
RIN 2577-AC18

Section 8 Housing Choice Voucher Program; Expansion of Payment Standard Protection

Monday, July 10, 2000

**\*42508** AGENCY: Office of the Assistant Secretary for Public and Indian Housing, HUD.

ACTION: Interim rule.

SUMMARY: On October 21, 1999, HUD published a final rule implementing the statutory merger of the Section 8 tenant-based and certificate programs into the new Housing Choice Voucher program. This interim rule amends HUD's regulations governing this new merger program to expand the regulatory payment standard protection against subsidy reduction. The October 21, 1999 final rule limited payment standard protection to the first 24 months of the lease term. The interim rule provides that a family is not subject to a subsidy reduction until the second regular reexamination of family income and composition following the payment standard reduction. This protection extends for the duration of the lease term. This interim rule also corrects a typographical error contained in the October 21, 1999 final rule.
DATES: Effective Date: August 9, 2000. Comment Due Date: September 8, 2000.

FOR FURTHER INFORMATION CONTACT: Gerald J. Benoit, Director, Real Estate and Housing Performance Division, Office of Public and Indian Housing, Department of Housing and Urban Development, Room 4220, 451 Seventh Street, SW, Washington, DC 20410; telephone (202) 708-0477, extension 4069 (this is not a toll-free number). Hearing or speech impaired individuals may access this number via TTY by calling the toll-free Federal Information Relay Service at 1-800-877-8339.

SUPPLEMENTARY INFORMATION:

## I. Background
On October 21, 1999 (64 FR 56894), HUD published a final rule implementing the Section 8 tenant-based program provisions of the Quality Housing and Work Responsibility Act of 1998 (Title V of the FY 1999 HUD Appropriations Act; Pub.L. 105-276, approved October 21, 1998) (referred to as the "Public Housing Reform Act"). Of particular significance, the October 21, 1999 final rule implemented section 545 of the Public Housing Reform Act. Section 545 provides for the complete merger of the Section 8 tenant-based certificate and voucher programs. HUD's regulations for the new Section 8 merger program (known as the "Housing Choice Voucher program") are located at 24 CFR part 982.

The October 21, 1999 final rule became effective on November 22, 1999. The final rule was preceded by HUD's publication of an interim rule on May 14, 1999 (64 FR 56894). The final rule took into consideration the public comments received on the interim rule, and most of the changes made at the final rule stage were in response to public comment.

## II. This Interim Rule
The October 21, 1999 final rule amended the part 982 regulations to provide that payment standard protection will only apply during the first two years of the lease term. After the first two years of the lease, a family's subsidy would be based on the appropriate payment standard determined at the last regular annual reexamination of family income.

On reconsideration, HUD believes that this provision is too restrictive. HUD wishes to provide the benefit of protected subsidy levels to a greater number of assisted families—not just to new participants in the Housing Choice Voucher program,

or assisted families moving to a new unit. HUD believes payment standard protection should extend for the duration of the lease term, and not be restricted to a limited number of years.

Accordingly, HUD is amending 24 CFR part 982 to expand the regulatory payment standard protection. This interim rule provides that a family is not subject to a subsidy reduction until the second regular reexamination of family income and composition following the payment standard reduction. This protection extends for the duration of the lease term.

This final rule also corrects a typographical error contained in the October 21, 1999 final rule. Specifically, the interim rule corrects § 982.501(c), which mistakenly provides that the provisions of § 982.521 apply solely to a tenancy under the Section 8 rental certificate program.

## III. Justification for Interim Rulemaking

In general, HUD publishes a rule for public comment before issuing a rule for effect, in accordance with its own regulations on rulemaking at 24 CFR part 10. Part 10, however, does provide for exceptions from that general rule where HUD finds good cause to omit advance notice and public participation. The good cause requirement is satisfied when the prior public procedure is "impracticable, unnecessary, or contrary to the public interest" (24 CFR 10.1). HUD finds that good cause exists to publish this rule for effect without first soliciting public comment, in that prior public procedure is contrary to the public interest. The reasons for HUD's determination are as follows.

HUD believes that the limits on payment standard protection established by the October 21, 1999 final rule are too restrictive. The interim rule corrects this error by providing assisted families with broader and more equitable regulatory safeguards against reductions in subsidy. Specifically, the interim rule extends the regulatory payment standard protection to all assisted families, not just to new program participants and assisted families moving to a new unit.

Delaying the effectiveness of this interim rule to solicit prior public comment would result in uncertainty among PHAs and affected families, as PHAs consider adjustments in payment standards under the existing requirements of the October 21, 1999 final rule without knowing the full scope of the additional regulatory changes to be made by HUD. Immediate effectiveness of this interim rule will reduce this uncertainty, and will allow PHAs to make payment standard adjustments knowing the likely implications of these decisions. Neither PHAs nor Section 8 residents will be disadvantaged by the change.

HUD also notes that the new Housing Choice Voucher program was implemented through an extensive public process, including three public forums across the nation, as well as the customary notice and comment rulemaking procedures.

Although HUD believes that good cause exists to publish this rule for effect without prior public comment, HUD recognizes the value of public comment in the development of its regulations. HUD has, therefore, issued these regulations on an interim basis and has provided the public with a 60-day comment period. HUD welcomes comment on the regulatory amendments made by this interim rule. The public comments will be addressed in the final rule.

## IV. Findings and Certifications

### Regulatory Planning and Review

The Office of Management and Budget (OMB) reviewed this rule under Executive Order 12866, Regulatory Planning and Review. OMB determined **\*42509** that this rule is a "significant regulatory action" as defined in section 3(f) of the Order (although not an economically significant regulatory action under the Order). Any changes made to this rule as a result of that review are identified in the docket file, which is available for public inspection in the office of the Department's Rules Docket Clerk, Room 10276, 451 Seventh Street, SW, Washington, DC 20410-0500.

### Environmental Impact

A Finding of No Significant Impact with respect to the environment was prepared on the October 21, 1999 final rule in accordance with the HUD regulations at 24 CFR part 50, which implement section 102(2)(C) of the National Environmental Policy Act (42 U.S.C. 4223). That Finding is applicable to this interim rule, and is available for public inspection between the

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.    2

hours of 7:30 a.m. and 5:30 p.m. weekdays in the Office of the Rules Docket Clerk, Office of General Counsel, Room 10276, Department of Housing and Urban Development, 451 Seventh Street, SW, Washington, DC.

### Regulatory Flexibility Act

The Secretary has reviewed this interim rule before publication and by approving it certifies, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), that this interim rule would not have a significant economic impact on a substantial number of small entities. The interim rule is exclusively concerned with public housing agencies that administer tenant-based housing assistance under Section 8 of the United States Housing Act of 1937. Specifically, the final rule would establish requirements governing tenant-based assistance for an eligible family. The interim regulatory amendments would not change the amount of funding available under the Section 8 voucher program. Accordingly, the economic impact of this rule will not be significant, and it will not affect a substantial number of small entities.

### Federalism Impact

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either imposes substantial direct compliance costs on State and local governments and is not required by statute, or the rule preempts State law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This interim rule would not have federalism implications and would not impose substantial direct compliance costs on State and local governments or preempt State law within the meaning of the Executive Order.

### Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531-1538) (UMRA) requires Federal agencies to assess the effects of their regulatory actions on State, local, and tribal governments and on the private sector. This interim rule does not impose, within the meaning of the UMRA, any Federal mandates on any State, local, or tribal governments or on the private sector.

### Catalog of Federal Domestic Assistance

The Catalog of Domestic Assistance number for this program is 14.855.

### List of Subjects in 24 CFR Part 982

Grant programs—housing and community development, Rent subsidies.

Accordingly, for the reasons discussed in the preamble, HUD is amending 24 CFR part 982 as follows:

### PART 982—SECTION 8 TENANT BASED ASSISTANCE: HOUSING CHOICE VOUCHER PROGRAM

1. The authority citation for part 982 continues to read as follows:

Authority: 42 U.S.C. 1437f and 3535(d).
 24 CFR § 982.501
2. In § 982.501(c), revise the reference to "982.520, and 982.521" to read "and 982.520."
 24 CFR § 982.505
3. Amend § 982.505 by revising paragraphs (c)(3), (c)(4), and (c)(5) to read as follows:
 24 CFR § 982.505

### § 982.505 Voucher tenancy: How to calculate housing assistance payment.

* * * * *

(c) * * *

(3) Decrease in the payment standard amount during the HAP contract term. If the amount on the payment standard schedule is decreased during the term of the HAP contract, the lower payment standard amount generally must be used to calculate the

monthly housing assistance payment for the family beginning at the effective date of the family's second regular reexamination following the effective date of the decrease in the payment standard amount. The PHA must determine the payment standard for the family as follows.

(i) Step 1: At the first regular reexamination following the decrease in the payment standard amount, the PHA shall determine the payment standard for the family in accordance with paragraphs (c)(1) and (c)(2) of this section (using the decreased payment standard amount).

(ii) Step 2 (first reexamination payment standard amount): The PHA shall compare the payment standard amount from step 1 to the payment standard amount last used to calculate the monthly housing assistance payment for the family. The payment standard amount used by the PHA to calculate the monthly housing assistance payment at the first regular reexamination following the decrease in the payment standard amount is the higher of these two payment standard amounts. The PHA shall advise the family that the application of the lower payment standard amount will be deferred until the second regular reexamination following the effective date of the decrease in the payment standard amount.

(iii) Step 3 (second reexamination payment standard amount): At the second regular reexamination following the decrease in the payment standard amount, the lower payment standard amount shall be used to calculate the monthly housing assistance payment for the family unless the PHA has subsequently increased the payment standard amount, in which case the payment standard amount is determined in accordance with paragraph (c)(4) of this section.

(4) Increase in the payment standard amount during the HAP contract term. If the payment standard amount is increased during the term of the HAP contract, the increased payment standard amount shall be used to calculate the monthly housing assistance payment for the family beginning at the effective date of the family's first regular reexamination on or after the effective date of the increase in the payment standard amount.

(5) Change in family unit size during the HAP contract term. Irrespective of any increase or decrease in the payment standard amount, if the family unit size increases or decreases during the HAP contract term, the new family unit size must be used to determine the payment standard amount for the family beginning at the family's first regular reexamination following the change in family unit size.

Dated: June 15, 2000.

Harold Lucas,

Assistant Secretary for Public and Indian Housing.

[FR Doc. 00-17024 Filed 7-7-00; 8:45 am]

BILLING CODE 4210-33-P

---

                                            © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 24. Housing and Urban Development
Subtitle B. Regulations Relating to Housing and Urban Development
Chapter IX. Office of Assistant Secretary for Public and Indian Housing, Department of Housing and Urban Development (Refs & Annos)
Part 982. Section 8 Tenant–Based Assistance: Housing Choice Voucher Program (Refs & Annos)
Subpart K. Rent and Housing Assistance Payment (Refs & Annos)

24 C.F.R. § 982.503

§ 982.503 Voucher tenancy: Payment standard amount and schedule.

Currentness

(a) Payment standard schedule.

(1) HUD publishes the fair market rents for each market area in the United States (see part 888 of this title). The PHA must adopt a payment standard schedule that establishes voucher payment standard amounts for each FMR area in the PHA jurisdiction. For each FMR area, the PHA must establish payment standard amounts for each "unit size." Unit size is measured by number of bedrooms (zero-bedroom, one-bedroom, and so on).

(2) The payment standard amounts on the PHA schedule are used to calculate the monthly housing assistance payment for a family (§ 982.505).

(3) The PHA voucher payment standard schedule shall establish a single payment standard amount for each unit size. For each unit size, the PHA may establish a single payment standard amount for the whole FMR area, or may establish a separate payment standard amount for each designated part of the FMR area.

(b) Establishing payment standard amounts.

(1)(i) The PHA may establish the payment standard amount for a unit size at any level between 90 percent and 110 percent of the published FMR for that unit size. HUD approval is not required to establish a payment standard amount in that range ("basic range").

(ii) The PHA may establish a separate payment standard amount within the basic range for a designated part of an FMR area.

(2) The PHA must request HUD approval to establish a payment standard amount that is higher or lower than the basic range. HUD has sole discretion to grant or deny approval of a higher or lower payment standard amount. Paragraphs (c) and (e) of this section describe the requirements for approval of a higher payment standard amount ("exception payment standard amount").

(c) HUD approval of exception payment standard amount.

(1) HUD discretion. At HUD's sole discretion, HUD may approve a payment standard amount that is higher than the basic range for a designated part of the fair market rent area (called an "exception area"). HUD may approve an exception payment standard amount in accordance with this paragraph (c) of this section for all units, or for all units of a given unit size, leased by program families in the exception area. Any PHA with jurisdiction in the exception area may use the HUD–approved exception payment standard amount.

(2) Above 110 percent of FMR to 120 percent of published FMR.

(i) The HUD Field Office may approve an exception payment standard amount from above 110 percent of the published FMR to 120 percent of the published FMR (upper range) if the HUD Field Office determines that approval is justified by either the median rent method or the 40th or 50th percentile rent method as described in paragraph (c)(2)(i)(B) of this section (and that such approval is also supported by an appropriate program justification in accordance with paragraph (c)(4) of this section).

   (A) Median rent method. In the median rent method, HUD determines the exception payment standard amount by multiplying the FMR times a fraction of which the numerator is the median gross rent of the exception area and the denominator is the median gross rent of the entire FMR area. In this method, HUD uses median gross rent data from the most recent decennial United States census, and the exception area may be any geographic entity within the FMR area (or any combination of such entities) for which median gross rent data is provided in decennial census products.

   (B) 40th or 50th percentile rent method. In this method, HUD determines that the area exception payment standard amount equals either the 40th or 50th percentile of rents for standard quality rental housing in the exception area. HUD determines whether the 40th or 50th percentile rent applies in accordance with the methodology described in § 888.113 of this title for determining FMRs. A PHA must present statistically representative rental housing survey data to justify HUD approval.

(ii) The HUD Field Office may approve an exception payment standard amount within the upper range if required as a reasonable accommodation for a family that includes a person with disabilities.

(3) Above 120 percent of FMR.

(i) At the request of a PHA, the Assistant Secretary for Public and Indian Housing may approve an exception payment standard amount for the total area of a county, PHA jurisdiction, or place if the Assistant Secretary determines that:

   (A) Such approval is necessary to prevent financial hardship for families;

   (B) Such approval is supported by statistically representative rental housing survey data to justify HUD approval in accordance with the methodology described in § 888.113 of this title; and

   (C) Such approval is also supported by an appropriate program justification in accordance with paragraph (c)(4) of this section.

(ii) For purposes of paragraph (c)(3) of this section, the term "place" is an incorporated place or a U.S. Census designated place. An incorporated place is established by State law and includes cities, boroughs, towns, and villages. A U.S. Census designated place is the statistical counterpart of an incorporated place.

(4) Program justification.

(i) HUD will only approve an exception payment standard amount (pursuant to paragraph (c)(2) or paragraph (c)(3) of this section) if HUD determines that approval of such higher amount is needed either:

(A) To help families find housing outside areas of high poverty, or

(B) Because voucher holders have trouble finding housing for lease under the program within the term of the voucher.

(ii) HUD will only approve an exception payment standard amount (pursuant to paragraph (c)(3) of this section) after six months from the date of HUD approval of an exception payment standard pursuant to paragraph (c)(2) of this section for the area.

(5) Population. The total population of HUD–approved exception areas in an FMR area may not include more than 50 percent of the population of the FMR area.

(6) Withdrawal or modification. At any time, HUD may withdraw or modify approval to use an exception payment standard amount.

(7) Transition: Area exception rents approved prior to merger date. Subject to paragraph (c)(6) of this section, the PHA may establish an exception payment standard amount up to the amount of a HUD–approved area exception rent in effect at the merger date.

(d) HUD approval of payment standard amount below the basic range. HUD may consider a PHA request for approval to establish a payment standard amount that is lower than the basic range. At HUD's sole discretion, HUD may approve PHA establishment of a payment standard lower than the basic range. In determining whether to approve the PHA request, HUD will consider appropriate factors, including rent burden of families assisted under the program. HUD will not approve a lower payment standard if the family share for more than 40 percent of participants in the PHA's voucher program exceeds 30 percent of adjusted monthly income. Such determination may be based on the most recent examinations of family income.

(e) HUD approval of success rate payment standard amounts. In order to increase the number of voucher holders who become participants, HUD may approve requests from PHAs whose FMRs are computed at the 40th percentile rent to establish higher, success rate payment standard amounts. A success rate payment standard amount is defined as any amount between 90 percent and 110 percent of the 50th percentile rent, calculated in accordance with the methodology described in § 888.113 of this title.

(1) A PHA may obtain HUD Field Office approval of success rate payment standard amounts provided the PHA demonstrates to HUD that it meets the following criteria:

(i) Fewer than 75 percent of the families to whom the PHA issued rental vouchers during the most recent 6 month period for which there is success rate data available have become participants in the voucher program;

(ii) The PHA has established payment standard amounts for all unit sizes in the entire PHA jurisdiction within the FMR area at 110 percent of the published FMR for at least the 6 month period referenced in paragraph (e)(1)(i) of this section and up to the time the request is made to HUD; and

(iii) The PHA has a policy of granting automatic extensions of voucher terms to at least 90 days to provide a family who has made sustained efforts to locate suitable housing with additional search time.

(2) In determining whether to approve the PHA request to establish success rate payment standard amounts, HUD will consider whether the PHA has a SEMAP overall performance rating of "troubled". If a PHA does not yet have a SEMAP rating, HUD will consider the PHA's SEMAP certification.

(3) HUD approval of success rate payment standard amounts shall be for all unit sizes in the FMR area. A PHA may opt to establish a success rate payment standard amount for one or more unit sizes in all or a designated part of the PHA jurisdiction within the FMR area.

(f) Payment standard protection for PHAs that meet deconcentration objectives. Paragraph (f) of this section applies only to a PHA with jurisdiction in an FMR area where the FMR had previously been set at the 50th percentile rent to provide a broad range of housing opportunities throughout a metropolitan area, pursuant to § 888.113(c), but is now set at the 40th percentile rent.

(1) Such a PHA may obtain HUD Field Office approval of a payment standard amount based on the 50th percentile rent if the PHA scored the maximum number of points on the deconcentration bonus indicator in § 985.3(h) in the prior year, or in two of the last three years.

(2) HUD approval of payment standard amounts based on the 50th percentile rent shall be for all unit sizes in the FMR area that had previously been set at the 50th percentile rent pursuant to § 888.113(c). A PHA may opt to establish a payment standard amount based on the 50th percentile rent for one or more unit sizes in all or a designated part of the PHA jurisdiction within the FMR area.

(g) HUD review of PHA payment standard schedules.

(1) HUD will monitor rent burdens of families assisted in a PHA's voucher program. HUD will review the PHA's payment standard for a particular unit size if HUD finds that 40 percent or more of such families occupying units of that unit size currently pay more than 30 percent of adjusted monthly income as the family share. Such determination may be based on the most recent examinations of family income.

(2) After such review, HUD may, at its discretion, require the PHA to modify payment standard amounts for any unit size on the PHA payment standard schedule. HUD may require the PHA to establish an increased payment standard amount within the basic range.

**Credits**

§ 982.503 Voucher tenancy: Payment standard amount and..., 24 C.F.R. § 982.503

[64 FR 26648, May 14, 1999; 64 FR 43613, Aug. 11, 1999; 64 FR 49658, Sept. 14, 1999; 64 FR 56911, 56914, Oct. 21, 1999; 65 FR 16822, March 30, 2000; 65 FR 58874, Oct. 2, 2000; 66 FR 30568, June 6, 2001; 67 FR 56688, Sept. 4, 2002]

SOURCE: 59 FR 36682, July 18, 1994; 60 FR 34695, July 3, 1995; 60 FR 45661, Sept. 1, 1995; 61 FR 11119, March 18, 1996; 63 FR 23857, April 30, 1998; 63 FR 23861, June 1, 1998; 65 FR 16821, March 30, 2000, unless otherwise noted.

AUTHORITY: 42 U.S.C. 1437f and 3535(d).

Notes of Decisions (2)

Current through January 30, 2014; 79 FR 5222

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**Code of Federal Regulations**
**Title 24. Housing and Urban Development**
**Subtitle B. Regulations Relating to Housing and Urban Development**
**Chapter IX. Office of Assistant Secretary for Public and Indian Housing, Department of Housing and Urban Development (Refs & Annos)**
**Part 982. Section 8 Tenant–Based Assistance: Housing Choice Voucher Program (Refs & Annos)**
**Subpart K. Rent and Housing Assistance Payment (Refs & Annos)**

24 C.F.R. § 982.516

§ 982.516 Family income and composition: Regular and interim examinations.

**Currentness**

(a) PHA responsibility for reexamination and verification.

(1) The PHA must conduct a reexamination of family income and composition at least annually.

(2) The PHA must obtain and document in the tenant file third party verification of the following factors, or must document in the tenant file why third party verification was not available:

(i) Reported family annual income;

(ii) The value of assets;

(iii) Expenses related to deductions from annual income; and

(iv) Other factors that affect the determination of adjusted income.

(b) When PHA conducts interim reexamination.

(1) At any time, the PHA may conduct an interim reexamination of family income and composition.

(2) At any time, the family may request an interim determination of family income or composition because of any changes since the last determination. The PHA must make the interim determination within a reasonable time after the family request.

(3) Interim examinations must be conducted in accordance with policies in the PHA administrative plan.

(c) Family reporting of change. The PHA must adopt policies prescribing when and under what conditions the family must report a change in family income or composition.

(d) Effective date of reexamination.

(1) The PHA must adopt policies prescribing how to determine the effective date of a change in the housing assistance payment resulting from an interim redetermination.

(2) At the effective date of a regular or interim reexamination, the PHA must make appropriate adjustments in the housing assistance payment. (For a voucher tenancy, the housing assistance payment shall be calculated in accordance with § 982.505. For a certificate tenancy, the housing assistance payment shall be calculated in accordance with § 982.518.)

(e) Family member income. Family income must include income of all family members, including family members not related by blood or marriage. If any new family member is added, family income must include any income of the additional family member. The PHA must conduct a reexamination to determine such additional income, and must make appropriate adjustments in the housing assistance payment.

(f) Accuracy of family income data. The PHA must establish procedures that are appropriate and necessary to assure that income data provided by applicant or participant families is complete and accurate.

(g) Execution of release and consent.

(1) As a condition of admission to or continued assistance under the program, the PHA shall require the family head, and such other family members as the PHA designates, to execute a HUD–approved release and consent form (including any release and consent as required under § 5.230 of this title) authorizing any depository or private source of income, or any Federal, State or local agency, to furnish or release to the PHA or HUD such information as the PHA or HUD determines to be necessary.

(2) The PHA and HUD must limit the use or disclosure of information obtained from a family or from another source pursuant to this release and consent to purposes directly in connection with administration of the program.

(Information collection requirements contained in this section have been approved by the Office of Management and Budget under control number 2577–0169.)

**Credits**

[64 FR 13057, March 16, 1999; 64 FR 26649, May 14, 1999; 64 FR 43613, Aug. 11, 1999; 64 FR 56911, 56915, Oct. 21, 1999; 65 FR 16822, March 30, 2000]

SOURCE: 59 FR 36682, July 18, 1994; 60 FR 34695, July 3, 1995; 60 FR 45661, Sept. 1, 1995; 61 FR 11119, March 18, 1996; 63 FR 23857, April 30, 1998; 63 FR 23861, June 1, 1998; 65 FR 16821, March 30, 2000, unless otherwise noted.

AUTHORITY: 42 U.S.C. 1437f and 3535(d).

Notes of Decisions (18)

**§ 982.516 Family income and composition: Regular and..., 24 C.F.R. § 982.516**

Current through January 30, 2014; 79 FR 5222

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 24. Housing and Urban Development
    Subtitle B. Regulations Relating to Housing and Urban Development
      Chapter IX. Office of Assistant Secretary for Public and Indian Housing, Department of Housing and Urban Development (Refs & Annos)
        Part 982. Section 8 Tenant–Based Assistance: Housing Choice Voucher Program (Refs & Annos)
          Subpart A. General Information (Refs & Annos)

24 C.F.R. § 982.1

§ 982.1 Programs: purpose and structure.

Currentness

(a) General description.

(1) In the HUD Housing Choice Voucher Program (Voucher Program) and the HUD certificate program, HUD pays rental subsidies so eligible families can afford decent, safe and sanitary housing. Both programs are generally administered by State or local governmental entities called public housing agencies (PHAs). HUD provides housing assistance funds to the PHA. HUD also provides funds for PHA administration of the programs. PHAs are no longer allowed to enter into contracts for assistance in the certificate program.

(2) Families select and rent units that meet program housing quality standards. If the PHA approves a family's unit and tenancy, the PHA contracts with the owner to make rent subsidy payments on behalf of the family. A PHA may not approve a tenancy unless the rents is reasonable.

(3) In the certificate program, the rental subsidy is generally based on the actual rent of a unit leased by the assisted family. In the voucher program, the rental subsidy is determined by a formula.

(4)(i) In the certificate program, the subsidy for most families is the difference between the rent and 30 percent of adjusted monthly income.

(ii) In the voucher program, the subsidy is based on a local "payment standard" that reflects the cost to lease a unit in the local housing market. If the rent is less than the payment standard, the family generally pays 30 percent of adjusted monthly income for rent. If the rent is more than the payment standard, the family pays a larger share of the rent.

(b) Tenant-based and project-based assistance.

(1) Section 8 assistance may be "tenant-based" or "project-based". In project-based programs, rental assistance is paid for families who live in specific housing developments or units. With tenant-based assistance, the assisted unit is selected by the family. The family may rent a unit anywhere in the United States in the jurisdiction of a PHA that runs a voucher program.

(2) To receive tenant-based assistance, the family selects a suitable unit. After approving the tenancy, the PHA enters into a contract to make rental subsidy payments to the owner to subsidize occupancy by the family. The PHA contract with the owner only covers a single unit and a specific assisted family. If the family moves out of the leased unit, the contract with the owner terminates. The family may move to another unit with continued assistance so long as the family is complying with program requirements.

**Credits**
[64 FR 26640, May 14, 1999; 64 FR 43613, Aug. 11, 1999; 64 FR 56911, Oct. 21, 1999]

SOURCE: 59 FR 36682, July 18, 1994; 60 FR 34695, July 3, 1995; 60 FR 45661, Sept. 1, 1995; 61 FR 11119, March 18, 1996; 63 FR 23857, April 30, 1998, unless otherwise noted.

AUTHORITY: 42 U.S.C. 1437f and 3535(d).

Notes of Decisions (160)

Current through January 30, 2014; 79 FR 5222

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated California Codes
  Government Code (Refs & Annos)
    Title 1. General
      Division 3.6. Claims and Actions Against Public Entities and Public Employees (Refs & Annos)
        Part 2. Liability of Public Entities and Public Employees (Refs & Annos)
          Chapter 1. General Provisions Relating to Liability (Refs & Annos)
            Article 2. Liability of Public Entities (Refs & Annos)

West's Ann.Cal.Gov.Code § 815.6

§ 815.6. Mandatory duty of public entity to protect against particular kinds of injuries

Currentness

Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.

**Credits**
(Added by Stats.1963, c. 1681, p. 3268, § 1.)

**Editors' Notes**

### LAW REVISION COMMISSION COMMENTS

This section declares the familiar rule, applicable to both public entities and private persons, that failure to comply with applicable statutory or regulatory standards is negligence unless reasonable diligence has been exercised in an effort to comply with those standards. Alarid v. Vanier, 50 Cal.2d 617, 327 P.2d 897 (1958) (setting forth general rule); Lehmann v. Los Angeles City Bd. of Educ., 154 Cal.App.2d 256, 316 P.2d 55 (1957) (applying rule to public entity).

In the sections that follow in this division, there are stated some immunities from this general rule of liability. See, for example, Section 818.2. [4 Cal.L.Rev.Comm. Reports 801 (1963)].

Notes of Decisions (309)

West's Ann. Cal. Gov. Code § 815.6, CA GOVT § 815.6
Current with all 2013 Reg.Sess. laws, all 2013-2014 1st Ex.Sess. laws, and Res. c. 123 (S.C.A.3)

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
    Title VII. Judgment

### Federal Rules of Civil Procedure Rule 56

### Rule 56. Summary Judgment

Currentness

<Notes of Decisions for 28 USCA Federal Rules of Civil Procedure Rule 56 are displayed in three separate documents. Notes of Decisions for subdivisions I to VI are contained in this document. For Notes of Decisions for subdivisions VII through XXV, see the second document for 28 USCA Federal Rules of Civil Procedure Rule 56. For Notes of Decisions for subdivisions XXVI to end, see the third document for 28 USCA Federal Rules of Civil Procedure Rule 56.>

**(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

**(b) Time to File a Motion.** Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.

**(c) Procedures.**

**(1)** *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**(2)** *Objection That a Fact Is Not Supported by Admissible Evidence*. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3)** *Materials Not Cited*. The court need consider only the cited materials, but it may consider other materials in the record.

**(4)** *Affidavits or Declarations*. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify

on the matters stated.

**(d) When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

    **(1)** defer considering the motion or deny it;

    **(2)** allow time to obtain affidavits or declarations or to take discovery; or

    **(3)** issue any other appropriate order.

**(e) Failing to Properly Support or Address a Fact.** If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

    **(1)** give an opportunity to properly support or address the fact;

    **(2)** consider the fact undisputed for purposes of the motion;

    **(3)** grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or

    **(4)** issue any other appropriate order.

**(f) Judgment Independent of the Motion.** After giving notice and a reasonable time to respond, the court may:

    **(1)** grant summary judgment for a nonmovant;

    **(2)** grant the motion on grounds not raised by a party; or

    **(3)** consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

**(g) Failing to Grant All the Requested Relief.** If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case.

**(h) Affidavit or Declaration Submitted in Bad Faith.** If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court--after notice and a reasonable time to respond--may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.

**CREDIT(S)**

(Amended December 27, 1946, effective March 19, 1948; January 21, 1963, effective July 1, 1963; March 2, 1987, effective August 1, 1987; April 30, 2007, effective December 1, 2007; March 26, 2009, effective December 1, 2009; April 28, 2010, effective December 1, 2010.)

**ADVISORY COMMITTEE NOTES**
1937 Adoption

This rule is applicable to all actions, including those against the United States or an officer or agency thereof.

Summary judgment procedure is a method for promptly disposing of actions in which there is no genuine issue as to any material fact. It has been extensively used in England for more than 50 years and has been adopted in a number of American states. New York, for example, has made great use of it. During the first nine years after its adoption there, the records of New York county alone show 5,600 applications for summary judgments. Report of the Commission on the Administration of Justice in New York State (1934), p. 383. See also *Third Annual Report of the Judicial Council of the State of New York* (1937), p. 30.

In England it was first employed only in cases of liquidated claims, but there has been a steady enlargement of the scope of the remedy until it is now used in actions to recover land or chattels and in all other actions at law, for liquidated or unliquidated claims, except for a few designated torts and breach of promise of marriage. *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 3, r. 6; Orders 14, 14A, and 15; see also O. 32, r. 6, authorizing an application for judgment at any time upon admissions. In Michigan (3 Comp.Laws (1929) § 14260) and Illinois (Smith-Hurd Ill.Stats. c. 110, §§ 181, 259.15, 259.16), it is not limited to liquidated demands. New York (N.Y.R.C.P. (1937) Rule 113; see also Rule 107) has brought so many classes of actions under the operation of the rule that the Commission on Administration of Justice in New York State (1934) recommend that all restrictions be removed and that the remedy be available "in any action" (p. 287). For the history and nature of the summary judgment procedure and citations of state statutes, see Clark and Samenow, *The Summary Judgment* (1929), 38 Yale L.J. 423.

**Note to Subdivision (d).** See Rule 16 (Pre-Trial Procedure; Formulating Issues) and the Note thereto.

**Note to Subdivisions (e) and (f).** These are similar to rules in Michigan. Mich.Court Rules Ann. (Searl, 1933) Rule 30.

1946 Amendment

**Note to Subdivision (a).** The amendment allows a claimant to move for a summary judgment at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party. This will normally operate to permit an earlier motion by the claimant than under the original rule, where the phrase "at any time after the pleading in answer thereto has been served" operates to prevent a claimant from moving for summary judgment, even in a case clearly proper for its exercise, until a formal answer has been filed. Thus in *Peoples Bank v. Federal Reserve Bank of San Francisco,* N.D.Cal.1944, 58 F.Supp. 25, the plaintiff's countermotion for a summary judgment was stricken as premature, because the defendant had not filed an answer. Since Rule 12(a) allows at least 20 days for an answer, that time plus the 10 days required in Rule 56(c) means that under original Rule 56(a) a minimum period of 30 days necessarily has to elapse in every case before the claimant can be heard on his right to a summary judgment. An extension of time by the court or the service of preliminary motions of any kind will prolong that period even further. In many cases this merely represents unnecessary delay. See *United States v. Adler's Creamery, Inc.,* C.C.A.2, 1939, 107 F.2d 987. The changes are in the interest of more expeditious litigation. The 20-day period, as provided, gives the defendant an opportunity to secure counsel and determine a course of action. But in a case where the defendant himself makes a motion for summary judgment within that time, there is no reason to restrict the plaintiff and the amended rule so provides.

**Subdivision (c).** The amendment of Rule 56(c), by the addition of the final sentence, resolves a doubt expressed in *Sartor v. Arkansas Natural Gas Corp.,* 1944, 64 S.Ct. 724, 321 U.S. 620, 88 L.Ed. 967. See also Commentary, Summary Judgment as to Damages, 1944, 7 Fed.Rules Serv. 974; *Madeirense Do Brasil S/A v. Stulman-Emrick Lumber Co.,* C.C.A.2d, 1945, 147 F.2d 399, certiorari denied 1945, 65 S.Ct. 1201, 325 U.S. 861, 89 L.Ed. 1982. It makes clear that although the question of

recovery depends on the amount of damages, the summary judgment rule is applicable and summary judgment may be granted in a proper case. If the case is not fully adjudicated it may be dealt with as provided in subdivision (d) of Rule 56, and the right to summary recovery determined by a preliminary order, interlocutory in character, and the precise amount of recovery left for trial.

**Subdivision (d).** Rule 54(a) defines "judgment" as including a decree and "any order from which an appeal lies." Subdivision (d) of Rule 56 indicates clearly, however, that a partial summary "judgment" is not a final judgment, and, therefore, that it is not appealable, unless in the particular case some statute allows an appeal from the interlocutory order involved. The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication is more nearly akin to the preliminary order under Rule 16, and likewise serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact. See *Leonard v. Socony-Vacuum Oil Co.,* C.C.A.7, 1942, 130 F.2d 535; *Biggins v. Oltmer Iron Works,* C.C.A.7, 1946, 154 F.2d 214; 3 *Moore's Federal Practice,* 1938, 3190-3192. Since interlocutory appeals are not allowed, except where specifically provided by statute, see 3 Moore, op. cit. supra, 3155-3156, this interpretation is in line with that policy, *Leonard v. Socony-Vacuum Oil Co.,* supra. See also *Audi Vision Inc. v. RCA Mfg. Co.,* C.C.A.2, 1943, 136 F.2d 621; *Toomey v. Toomey,* 1945, 149 F.2d 19, 80 U.S.App.D.C. 77; *Biggins v. Oltmer Iron Works,* supra; *Catlin v. United States,* 1945, 65 S.Ct. 631, 324 U.S. 229, 89 L.Ed. 911.

1963 Amendment

**Subdivision (c).** By the amendment "answers to interrogatories" are included among the materials which may be considered on motion for summary judgment. The phrase was inadvertently omitted from the rule, see 3 Barron & Holtzoff, *Federal Practice & Procedure* 159-60 (Wright ed. 1958), and the courts have generally reached by interpretation the result which will hereafter be required by the text of the amended rule. See Annot., 74 A.L.R.2d 984 (1960).

**Subdivision (e).** The words "answers to interrogatories" are added in the third sentence of this subdivision to conform to the amendment of subdivision (c).

The last two sentences are added to overcome a line of cases, chiefly in the Third Circuit, which has impaired the utility of the summary judgment device. A typical case is as follows: A party supports his motion for summary judgment by affidavits or other evidentiary matter sufficient to show that there is no genuine issue as to a material fact. The adverse party, in opposing the motion, does not produce any evidentiary matter, or produces some but not enough to establish that there is a genuine issue for trial. Instead, the adverse party rests on averments of his pleadings which on their face present an issue. In this situation Third Circuit cases have taken the view that summary judgment must be denied, at least if the averments are "well-pleaded," and not suppositious, conclusory, or ultimate. See *Frederick Hart & Co., Inc. v. Recordgraph Corp.,* 169 F.2d 580 (3d Cir. 1948); *United States ex rel. Kolton v. Halpern,* 260 F.2d 590 (3d Cir. 1958); *United States ex rel. Nobles v. Ivey Bros. Constr. Co., Inc.,* 191 F.Supp. 383 (D.Del.1961); *Jamison v. Pennsylvania Salt Mfg. Co.,* 22 F.R.D. 238 (W.D.Pa.1958); *Bunny Bear, Inc. v. Dennis Mitchell Industries,* 139 F.Supp. 542 (E.D.Pa.1956); *Levy v. Equitable Life Assur. Society,* 18 F.R.D. 164 (E.D.Pa.1955).

The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. The Third Circuit doctrine, which permits the pleadings themselves to stand in the way of granting an otherwise justified summary judgment, is incompatible with the basic purpose of the rule. See 6 *Moore's Federal Practice* 2069 (2d ed. 1953); 3 Barron & Holtzoff, supra, § 1235.1.

It is hoped that the amendment will contribute to the more effective utilization of the salutary device of summary judgment.

The amendment is not intended to derogate from the solemnity of the pleadings. Rather it recognizes that, despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary.

Nor is the amendment designed to affect the ordinary standards applicable to the summary judgment motion. So, for example: Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate. Where the evidentiary matter in support of the motion does

not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented. And summary judgment may be inappropriate where the party opposing it shows under subdivision (f) that he cannot at the time present facts essential to justify his opposition.

1987 Amendment

The amendments are technical. No substantive change is intended.

2007 Amendments

The language of Rule 56 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Former Rule 56(a) and (b) referred to summary-judgment motions on or against a claim, counterclaim, or crossclaim, or to obtain a declaratory judgment. The list was incomplete. Rule 56 applies to third-party claimants, intervenors, claimants in interpleader, and others. Amended Rule 56(a) and (b) carry forward the present meaning by referring to a party claiming relief and a party against whom relief is sought.

Former Rule 56(c), (d), and (e) stated circumstances in which summary judgment "shall be rendered," the court "shall if practicable" ascertain facts existing without substantial controversy, and "if appropriate, shall" enter summary judgment. In each place "shall" is changed to "should." It is established that although there is no discretion to enter summary judgment when there is a genuine issue as to any material fact, there is discretion to deny summary judgment when it appears that there is no genuine issue as to any material fact. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256-257 (1948). Many lower court decisions are gathered in 10A Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d, § 2728. "Should" in amended Rule 56(c) recognizes that courts will seldom exercise the discretion to deny summary judgment when there is no genuine issue as to any material fact. Similarly sparing exercise of this discretion is appropriate under Rule 56(e)(2). Rule 56(d)(1), on the other hand, reflects the more open-ended discretion to decide whether it is practicable to determine what material facts are not genuinely at issue.

Former Rule 56(d) used a variety of different phrases to express the Rule 56(c) standard for summary judgment--that there is no genuine issue as to any material fact. Amended Rule 56(d) adopts terms directly parallel to Rule 56(c).

2009 Amendments

The timing provisions for summary judgment are outmoded. They are consolidated and substantially revised in new subdivision (c)(1). The new rule allows a party to move for summary judgment at any time, even as early as the commencement of the action. If the motion seems premature both subdivision (c)(1) and Rule 6(b) allow the court to extend the time to respond. The rule does set a presumptive deadline at 30 days after the close of all discovery.

The presumptive timing rules are default provisions that may be altered by an order in the case or by local rule. Scheduling orders are likely to supersede the rule provisions in most cases, deferring summary-judgment motions until a stated time or establishing different deadlines. Scheduling orders tailored to the needs of the specific case, perhaps adjusted as it progresses, are likely to work better than default rules. A scheduling order may be adjusted to adopt the parties' agreement on timing, or may require that discovery and motions occur in stages--including separation of expert-witness discovery from other discovery.

Local rules may prove useful when local docket conditions or practices are incompatible with the general Rule 56 timing provisions.

If a motion for summary judgment is filed before a responsive pleading is due from a party affected by the motion, the time for responding to the motion is 21 days after the responsive pleading is due.

**2010 Amendments**

Rule 56 is revised to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

**Subdivision (a).** Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word--genuine "issue" becomes genuine "dispute." "Dispute" better reflects the focus of a summary-judgment determination. As explained below, "shall" also is restored to the place it held from 1938 to 2007.

The first sentence is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense. The subdivision caption adopts the common phrase "partial summary judgment" to describe disposition of less than the whole action, whether or not the order grants all the relief requested by the motion.

"Shall" is restored to express the direction to grant summary judgment. The word "shall" in Rule 56 acquired significance over many decades of use. Rule 56 was amended in 2007 to replace "shall" with "should" as part of the Style Project, acting under a convention that prohibited any use of "shall." Comments on proposals to amend Rule 56, as published in 2008, have shown that neither of the choices available under the Style Project conventions--"must" or "should"--is suitable in light of the case law on whether a district court has discretion to deny summary judgment when there appears to be no genuine dispute as to any material fact. Compare *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)("Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case in which there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249 * * * (1948)"), with *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Eliminating "shall" created an unacceptable risk of changing the summary-judgment standard. Restoring "shall" avoids the unintended consequences of any other word.

Subdivision (a) also adds a new direction that the court should state on the record the reasons for granting or denying the motion. Most courts recognize this practice. Among other advantages, a statement of reasons can facilitate an appeal or subsequent trial-court proceedings. It is particularly important to state the reasons for granting summary judgment. The form and detail of the statement of reasons are left to the court's discretion.

The statement on denying summary judgment need not address every available reason. But identification of central issues may help the parties to focus further proceedings.

**Subdivision (b).** The timing provisions in former subdivisions (a) and (c) are superseded. Although the rule allows a motion for summary judgment to be filed at the commencement of an action, in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had. Scheduling orders or other pretrial orders can regulate timing to fit the needs of the case.

**Subdivision (c).** Subdivision (c) is new. It establishes a common procedure for several aspects of summary-judgment motions synthesized from similar elements developed in the cases or found in many local rules.

Subdivision (c)(1) addresses the ways to support an assertion that a fact can or cannot be genuinely disputed. It does not address the form for providing the required support. Different courts and judges have adopted different forms including, for example, directions that the support be included in the motion, made part of a separate statement of facts, interpolated in the body of a brief or memorandum, or provided in a separate statement of facts included in a brief or memorandum.

Subdivision (c)(1)(A) describes the familiar record materials commonly relied upon and requires that the movant cite the particular parts of the materials that support its fact positions. Materials that are not yet in the record--including materials referred to in an affidavit or declaration--must be placed in the record. Once materials are in the record, the court may, by

order in the case, direct that the materials be gathered in an appendix, a party may voluntarily submit an appendix, or the parties may submit a joint appendix. The appendix procedure also may be established by local rule. Pointing to a specific location in an appendix satisfies the citation requirement. So too it may be convenient to direct that a party assist the court in locating materials buried in a voluminous record.

Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. One party, without citing any other materials, may respond or reply that materials cited to dispute or support a fact do not establish the absence or presence of a genuine dispute. And a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.

Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

Subdivision (c)(3) reflects judicial opinions and local rules provisions stating that the court may decide a motion for summary judgment without undertaking an independent search of the record. Nonetheless, the rule also recognizes that a court may consider record materials not called to its attention by the parties.

Subdivision (c)(4) carries forward some of the provisions of former subdivision (e)(1). Other provisions are relocated or omitted. The requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record.

A formal affidavit is no longer required. 28 U.S.C. § 1746 allows a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit.

**Subdivision (d).** Subdivision (d) carries forward without substantial change the provisions of former subdivision (f).

A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion.

**Subdivision (e).** Subdivision (e) addresses questions that arise when a party fails to support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c). As explained below, summary judgment cannot be granted by default even if there is a complete failure to respond to the motion, much less when an attempted response fails to comply with Rule 56(c) requirements. Nor should it be denied by default even if the movant completely fails to reply to a nonmovant's response. Before deciding on other possible action, subdivision (e)(1) recognizes that the court may afford an opportunity to properly support or address the fact. In many circumstances this opportunity will be the court's preferred first step.

Subdivision (e)(2) authorizes the court to consider a fact as undisputed for purposes of the motion when response or reply requirements are not satisfied. This approach reflects the "deemed admitted" provisions in many local rules. The fact is considered undisputed only for purposes of the motion; if summary judgment is denied, a party who failed to make a proper Rule 56 response or reply remains free to contest the fact in further proceedings. And the court may choose not to consider the fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute.

Subdivision (e)(3) recognizes that the court may grant summary judgment only if the motion and supporting materials--including the facts considered undisputed under subdivision (e)(2)--show that the movant is entitled to it. Considering some facts undisputed does not of itself allow summary judgment. If there is a proper response or reply as to some facts, the court cannot grant summary judgment without determining whether those facts can be genuinely disputed. Once the court has determined the set of facts--both those it has chosen to consider undisputed for want of a proper response or reply and any that cannot be genuinely disputed despite a procedurally proper response or reply--it must determine the legal consequences of these facts and permissible inferences from them.

Subdivision (e)(4) recognizes that still other orders may be appropriate. The choice among possible orders should be designed to encourage proper presentation of the record. Many courts take extra care with pro se litigants, advising them of the need to respond and the risk of losing by summary judgment if an adequate response is not filed. And the court may seek to reassure itself by some examination of the record before granting summary judgment against a pro se litigant.

**Subdivision (f).** Subdivision (f) brings into Rule 56 text a number of related procedures that have grown up in practice. After giving notice and a reasonable time to respond the court may grant summary judgment for the nonmoving party; grant a motion on legal or factual grounds not raised by the parties; or consider summary judgment on its own. In many cases it may prove useful first to invite a motion; the invited motion will automatically trigger the regular procedure of subdivision (c).

**Subdivision (g).** Subdivision (g) applies when the court does not grant all the relief requested by a motion for summary judgment. It becomes relevant only after the court has applied the summary-judgment standard carried forward in subdivision (a) to each claim, defense, or part of a claim or defense, identified by the motion. Once that duty is discharged, the court may decide whether to apply the summary-judgment standard to dispose of a material fact that is not genuinely in dispute. The court must take care that this determination does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes.

If it is readily apparent that the court cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial. Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established. The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.

**Subdivision (h).** Subdivision (h) carries forward former subdivision (g) with three changes. Sanctions are made discretionary, not mandatory, reflecting the experience that courts seldom invoke the independent Rule 56 authority to impose sanctions. *See* Cecil & Cort, Federal Judicial Center Memorandum on Federal Rule of Civil Procedure 56(g) Motions for Sanctions (April 2, 2007). In addition, the rule text is expanded to recognize the need to provide notice and a reasonable time to respond. Finally, authority to impose other appropriate sanctions also is recognized.

Notes of Decisions (1603)

Fed. Rules Civ. Proc. Rule 56, 28 U.S.C.A., FRCP Rule 56
Amendments received to 12-1-13

**End of Document**                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
 Title 24. Housing and Urban Development
  Subtitle B. Regulations Relating to Housing and Urban Development
   Chapter IX. Office of Assistant Secretary for Public and Indian Housing, Department of Housing and Urban Development (Refs & Annos)
    Part 982. Section 8 Tenant–Based Assistance: Housing Choice Voucher Program (Refs & Annos)
     Subpart K. Rent and Housing Assistance Payment (Refs & Annos)

24 C.F.R. § 982.505

§ 982.505 Voucher tenancy: How to calculate housing assistance payment.

Currentness

(a) Use of payment standard. A payment standard is used to calculate the monthly housing assistance payment for a family. The "payment standard" is the maximum monthly subsidy payment.

(b) Amount of monthly housing assistance payment. The PHA shall pay a monthly housing assistance payment on behalf of the family that is equal to the lower of:

(1) The payment standard for the family minus the total tenant payment; or

(2) The gross rent minus the total tenant payment.

(c) Payment standard for family.

(1) The payment standard for the family is the lower of:

(i) The payment standard amount for the family unit size; or

(ii) The payment standard amount for the size of the dwelling unit rented by the family.

(2) If the PHA has established a separate payment standard amount for a designated part of an FMR area in accordance with § 982.503 (including an exception payment standard amount as determined in accordance with § 982.503(b)(2) and § 982.503(c)), and the dwelling unit is located in such designated part, the PHA must use the appropriate payment standard amount for such designated part to calculate the payment standard for the family. The payment standard for the family shall be calculated in accordance with this paragraph and paragraph (c)(1) of this section.

(3) Decrease in the payment standard amount during the HAP contract term. If the amount on the payment standard schedule is decreased during the term of the HAP contract, the lower payment standard amount generally must be used to calculate the monthly housing assistance payment for the family beginning at the effective date of the family's second regular reexamination following the effective date of the decrease in the payment standard amount. The PHA must determine the payment standard for the family as follows.

(i) Step 1: At the first regular reexamination following the decrease in the payment standard amount, the PHA shall determine the payment standard for the family in accordance with paragraphs (c)(1) and (c)(2) of this section (using the decreased payment standard amount).

(ii) Step 2 (first reexamination payment standard amount): The PHA shall compare the payment standard amount from step 1 to the payment standard amount last used to calculate the monthly housing assistance payment for the family. The payment standard amount used by the PHA to calculate the monthly housing assistance payment at the first regular reexamination following the decrease in the payment standard amount is the higher of these two payment standard amounts. The PHA shall advise the family that the application of the lower payment standard amount will be deferred until the second regular reexamination following the effective date of the decrease in the payment standard amount.

(iii) Step 3 (second reexamination payment standard amount): At the second regular reexamination following the decrease in the payment standard amount, the lower payment standard amount shall be used to calculate the monthly housing assistance payment for the family unless the PHA has subsequently increased the payment standard amount, in which case the payment standard amount is determined in accordance with paragraph (c)(4) of this section.

(4) Increase in the payment standard amount during the HAP contract term. If the payment standard amount is increased during the term of the HAP contract, the increased payment standard amount shall be used to calculate the monthly housing assistance payment for the family beginning at the effective date of the family's first regular reexamination on or after the effective date of the increase in the payment standard amount.

(5) Change in family unit size during the HAP contract term. Irrespective of any increase or decrease in the payment standard amount, if the family unit size increases or decreases during the HAP contract term, the new family unit size must be used to determine the payment standard amount for the family beginning at the family's first regular reexamination following the change in family unit size.

(d) PHA approval of higher payment standard for the family as a reasonable accommodation. If the family includes a person with disabilities and requires a higher payment standard for the family, as a reasonable accommodation for such person, in accordance with part 8 of this title, the PHA may establish a higher payment standard for the family within the basic range.

**Credits**
[64 FR 26647, 26648, May 14, 1999; 64 FR 43613, Aug. 11, 1999; 64 FR 49658, Sept. 14, 1999; 64 FR 56911, 56914, Oct. 21, 1999; 65 FR 16822, March 30, 2000; 65 FR 42509, July 10, 2000; 66 FR 30568, June 6, 2001; 67 FR 56689, Sept. 4, 2002]

SOURCE: 59 FR 36682, July 18, 1994; 60 FR 34695, July 3, 1995; 60 FR 45661, Sept. 1, 1995; 61 FR 11119, March 18, 1996; 63 FR 23857, April 30, 1998; 63 FR 23861, June 1, 1998; 65 FR 16821, March 30, 2000, unless otherwise noted.

AUTHORITY: 42 U.S.C. 1437f and 3535(d).

Current through January 30, 2014; 79 FR 5222

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

| 9th Circuit Case Number(s) | 13-56223 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

*******************************************************************************

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) February 21, 2014 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)    /s/  Barrett s. Litt

*******************************************************************************

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)